## COX v. LOUISIANA.

No. 49. Argued October 21–22, 1964.—Decided January 18, 1965.

*Nils Douglas* argued the cause for appellant. With him on the brief were *Carl Rachlin, Robert Collins* and *Floyd McKissick.*

*Ralph L. Roy* argued the cause for appellee. With him on the brief was *Jack P. F. Gremillion,* Attorney General of Louisiana.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

Appellant was convicted of violating a Louisiana statute which provides:

> "Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana . . . shall be fined not more than five thousand dollars or imprisoned not more than one year, or both." La. Rev. Stat. § 14:401 (Cum. Supp. 1962).

This charge was based upon the same set of facts as the "disturbing the peace" and "obstructing a public passage" charges involved and set forth in No. 24, *ante,* and was tried along with those offenses. Appellant was convicted on this charge also and was sentenced to the maximum penalty under the statute of one year in jail and a $5,000 fine, which penalty was cumulative with those in No. 24. These convictions were affirmed by the Louisiana Supreme Court, 245 La. 303, 158 So. 2d 172. Appellant appealed to this Court contending that the statute was unconstitutional on its face and as applied to him. We noted probable jurisdiction, 377 U. S. 921.

### I.

We shall first consider appellant's contention that this statute must be declared invalid on its face as an unjustified restriction upon freedoms guaranteed by the First and Fourteenth Amendments to the United States Constitution.

This statute was passed by Louisiana in 1950 and was modeled after a bill pertaining to the federal judiciary, which Congress enacted later in 1950, 64 Stat. 1018, 18 U. S. C. § 1507 (1958 ed.). Since that time, Massachusetts and Pennsylvania have passed similar statutes. Mass. Ann. Laws, c. 268, § 13A; Purdon's Pa. Stat. Ann., Tit. 18, § 4327. The federal statute resulted from the picketing of federal courthouses by partisans of the defendants during trials involving leaders of the Communist Party. This picketing prompted an adverse reaction from both the bar and the general public. A number of groups urged legislation to prohibit it. At a special meeting held in March 1949, the Judicial Conference of the United States passed the following resolution: *"Resolved,* That we condemn the practice of picketing the courts, and believe that effective means should be taken to prevent it." Report of the Judicial Conference of the United States, 203 (1949). A Special Committee on Proposed Legislation to Prohibit Picketing of the Courts was appointed to make recommendations to the Conference on this subject. *Ibid.* In its Report to the Judicial Conference, dated September 23, 1949, at p. 3, the Special Committee stated: "The sentiment of bar associations and individual lawyers has been and is practically unanimous in favor of legislation to prohibit picketing of courts." Upon the recommendation of this Special Committee, the Judicial Conference urged the prompt enactment of the then-pending bill. Report of the Judicial Conference of the United States, 17–18 (1949). Similar recommendations were made by the American Bar Association, numerous state and local bar associations, and individual lawyers and judges. See Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 1681 and H. R. 3766, 81st Cong., 1st Sess.; H. R. Rep. No. 1281, 81st Cong., 1st Sess.; S. Rep. No. 732, 81st Cong., 1st Sess.; Bills Con-

demning Picketing of Courts Before Congress, 33 J. Am.
Jud. Soc. 53 (1949).

This statute, unlike the two previously considered, is a
precise, narrowly drawn regulatory statute which pro-
scribes certain specific behavior. Cf. *Edwards* v. *South
Carolina,* 372 U. S. 229, 236. It prohibits a particular
type of conduct, namely, picketing and parading, in a few
specified locations, in or near courthouses.

There can be no question that a State has a legitimate
interest in protecting its judicial system from the pres-
sures which picketing near a courthouse might create.
Since we are committed to a government of laws and not
of men, it is of the utmost importance that the adminis-
tration of justice be absolutely fair and orderly. This
Court has recognized that the unhindered and untram-
meled functioning of our courts is part of the very foun-
dation of our constitutional democracy. See *Wood* v.
*Georgia,* 370 U. S. 375, 383. The constitutional safe-
guards relating to the integrity of the criminal process
attend every stage of a criminal proceeding, starting with
arrest and culminating with a trial "in a courtroom pre-
sided over by a judge." *Rideau* v. *Louisiana,* 373 U. S.
723, 727. There can be no doubt that they embrace the
fundamental conception of a fair trial, and that they ex-
clude influence or domination by either a hostile or
friendly mob. There is no room at any stage of judicial
proceedings for such intervention; mob law is the very
antithesis of due process. See *Frank* v. *Mangum,* 237
U. S. 309, 347 (Holmes, J., dissenting). A State may
adopt safeguards necessary and appropriate to assure that
the administration of justice at all stages is free from out-
side control and influence. A narrowly drawn statute such
as the one under review is obviously a safeguard both
necessary and appropriate to vindicate the State's interest
in assuring justice under law.

Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited. The most classic of these was pointed out long ago by Mr. Justice Holmes: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck* v. *United States,* 249 U. S. 47, 52. A man may be punished for encouraging the commission of a crime, *Fox* v. *Washington,* 236 U. S. 273, or for uttering "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. This principle has been applied to picketing and parading in labor disputes. See *Hughes* v. *Superior Court,* 339 U. S. 460; *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490; *Building Service Employees* v. *Gazzam,* 339 U. S. 532. But cf. *Thornhill* v. *Alabama,* 310 U. S. 88. These authorities make it clear, as the Court said in *Giboney,* that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co., supra,* at 502.

*Bridges* v. *California,* 314 U. S. 252, and *Pennekamp* v. *Florida,* 328 U. S. 331, do not hold to the contrary. Both these cases dealt with the power of a judge to sentence for contempt persons who published or caused to be published writings commenting on judicial proceedings. They involved newspaper editorials, an editorial cartoon, and a telegram sent by a labor leader to the Secretary of Labor. Here we deal not with the contempt power—

a power which is "based on a common law concept of the most general and undefined nature." *Bridges* v. *California, supra,* at 260. Rather, we are reviewing a statute narrowly drawn to punish specific conduct that infringes a substantial state interest in protecting the judicial process. See *Cantwell* v. *Connecticut,* 310 U. S. 296, 307–308; *Giboney* v. *Empire Storage & Ice Co., supra.* We are not concerned here with such a pure form of expression as newspaper comment or a telegram by a citizen to a public official. We deal in this case not with free speech alone, but with expression mixed with particular conduct. In *Giboney*, this Court expressly recognized this distinction when it said, "In holding this, we are mindful of the essential importance to our society of a vigilant protection of freedom of speech and press. *Bridges* v. *California,* 314 U. S. 252, 263. States cannot consistently with our Constitution abridge those freedoms to obviate slight inconveniences or annoyances. *Schneider* v. *State,* 308 U. S. 147, 162. But placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control." 336 U. S., at 501–502.

We hold that this statute on its face is a valid law dealing with conduct subject to regulation so as to vindicate important interests of society and that the fact that free speech is intermingled with such conduct does not bring with it constitutional protection.

## II.

We now deal with the Louisiana statute as applied to the conduct in this case. The group of 2,000, led by appellant, paraded and demonstrated before the courthouse. Judges and court officers were in attendance to discharge their respective functions. It is undisputed that a major purpose of the demonstration was to protest

what the demonstrators considered an "illegal" arrest of 23 students the previous day. While the students had not been arraigned or their trial set for any day certain, they were charged with violation of the law, and the judges responsible for trying them and passing upon the legality of their arrest were then in the building.

It is, of course, true that most judges will be influenced only by what they see and hear in court. However, judges are human; and the legislature has the right to recognize the danger that some judges, jurors, and other court officials, will be consciously or unconsciously influenced by demonstrations in or near their courtrooms both prior to and at the time of the trial. A State may also properly protect the judicial process from being misjudged in the minds of the public. Suppose demonstrators paraded and picketed for weeks with signs asking that indictments be dismissed, and that a judge, completely uninfluenced by these demonstrations, dismissed the indictments. A State may protect against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process. See S. Rep. No. 732, 81st Cong., 1st Sess., 4.

Appellant invokes the clear and present danger doctrine in support of his argument that the statute cannot constitutionally be applied to the conduct involved here. He says, relying upon *Pennekamp* and *Bridges*, that "[n]o reason exists to apply a different standard to the case of a criminal penalty for a peaceful demonstration in front of a courthouse than the standard of clear and present danger applied in the contempt cases." (Appellant's Br., p. 22.) He defines the standard to be applied to both situations to be whether the expression of opinion presents a clear and present danger to the administration of justice.

We have already pointed out the important differences between the contempt cases and the present one, *supra*, at 563–564. Here we deal not with the contempt power but with a narrowly drafted statute and not with speech in its pristine form but with conduct of a totally different character. Even assuming the applicability of a general clear and present danger test, it is one thing to conclude that the mere publication of a newspaper editorial or a telegram to a Secretary of Labor, however critical of a court, presents no clear and present danger to the administration of justice and quite another thing to conclude that crowds, such as this, demonstrating before a courthouse may not be prohibited by a legislative determination based on experience that such conduct inherently threatens the judicial process. We therefore reject the clear and present danger argument of appellant.

### III.

Appellant additionally argues that his conviction violated due process as there was no evidence of intent to obstruct justice or influence any judicial official as required by the statute. *Thompson* v. *Louisville,* 362 U. S. 199. We cannot agree that there was no evidence within the "due process" rule enunciated in *Thompson* v. *Louisville.* We have already noted that various witnesses and Cox himself stated that a major purpose of the demonstration was to protest what was considered to be an illegal arrest of 23 students. Thus, the very subject matter of the demonstration was an arrest which is normally the first step in a series of legal proceedings. The demonstration was held in the vicinity of the courthouse where the students' trials would take place. The courthouse contained the judges who in normal course would be called upon to try the students' cases just as they tried appellant. Ronnie Moore, the student leader of the demonstration, a defense witness, stated, as we understand

his testimony, that the demonstration was in part to protest injustice; he felt it was a form of "moral persuasion" and hoped it would have its effects. The fact that the students were not then on trial and had not been arraigned is not controlling in the face of this affirmative evidence manifesting the plain intent of the demonstrators to condemn the arrest and ensuing judicial proceedings against the prisoners as unfair and unwarranted. The fact that by their lights appellant and the 2,000 students were seeking justice and not its obstruction is as irrelevant as would be the motives of the mob condemned by Justice Holmes in *Frank* v. *Mangum, supra.* Louisiana, as we have pointed out *supra,* has the right to construe its statute to prevent parading and picketing from unduly influencing the administration of justice at any point or time in its process, regardless of whether the motives of the demonstrators are good or bad.

While this case contains direct evidence taking it out of the *Thompson* v. *Louisville* doctrine, even without this evidence, we would be compelled to reject the contention that there was no proof of intent. Louisiana surely has the right to infer the appropriate intent from circumstantial evidence. At the very least, a group of demonstrators parading and picketing before a courthouse where a criminal charge is pending, in protest against the arrest of those charged, may be presumed to intend to influence judges, jurors, witnesses or court officials. Cf. *Screws* v. *United States,* 325 U. S. 91, 107 (opinion of MR. JUSTICE DOUGLAS).

Absent an appropriately drawn and applicable statute, entirely different considerations would apply if, for example, the demonstrators were picketing to protest the actions of a mayor or other official of a city completely unrelated to any judicial proceedings, who just happened to have an office located in the courthouse building. Cf. *In re Brinn,* 305 N. Y. 887, 114 N. E. 2d 430; Joint Hearings, *supra,* at 20.

## IV.

There are, however, more substantial constitutional objections arising from appellant's conviction on the particular facts of this case. Appellant was convicted for demonstrating not "in," but "near" the courthouse. It is undisputed that the demonstration took place on the west sidewalk, the far side of the street, exactly 101 feet from the courthouse steps and, judging from the pictures in the record, approximately 125 feet from the courthouse itself. The question is raised as to whether the failure of the statute to define the word "near" renders it unconstitutionally vague. See *Lanzetta* v. *New Jersey,* 306 U. S. 451. Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67. It is clear that there is some lack of specificity in a word such as "near." [1] While this lack of specificity may not render the statute unconstitutionally vague, at least as applied to a demonstration within the sight and hearing of those in the courthouse, [2] it is clear that the statute, with respect to the determination of how near the courthouse a particular demonstration can be, foresees a degree of on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing it. It is apparent that demonstrators, such as those involved

---

[1] This is to be contrasted, for example, with the express limitation proscribing certain acts within 500 feet of foreign embassies, legations, or consulates within the District of Columbia. 52 Stat. 30 (1938); D. C. Code, 1961, § 22–1115. See also McKinney's N. Y. Laws, Penal Law § 600 (prohibiting certain activities within 200 feet of a courthouse).

[2] Cf. *United States* v. *National Dairy Products Corp.,* 372 U. S. 29; Note, 109 U. Pa. L. Rev. 67. Cf. *Cole* v. *Arkansas,* 333 U. S. 196 (holding constitutional a statute making certain types of action unlawful if done "at or near" any place where a labor dispute exists, though the issue of the possible vagueness of the word "near" in the context of that case was not expressly faced).

here, would justifiably tend to rely on this administrative interpretation of how "near" the courthouse a particular demonstration might take place. Louisiana's statutory policy of preserving order around the courthouse would counsel encouragement of just such reliance. This administrative discretion to construe the term "near" concerns a limited control of the streets and other areas in the immediate vicinity of the courthouse and is the type of narrow discretion which this Court has recognized as the proper role of responsible officials in making determinations concerning the time, place, duration, and manner of demonstrations. See *Cox* v. *New Hampshire,* 312 U. S. 569; *Poulos* v. *New Hampshire,* 345 U. S. 395. See generally the discussion on this point in No. 24, pp. 553–558, *ante.* It is not the type of unbridled discretion which would allow an official to pick and choose among expressions of view the ones he will permit to use the streets and other public facilities, which we have invalidated in the obstruction of public passages statute as applied in No. 24, *ante.* Nor does this limited administrative regulation of traffic which the Court has consistently recognized as necessary and permissible, constitute a waiver of law which is beyond the power of the police. Obviously telling demonstrators how far from the courthouse steps is "near" the courthouse for purposes of a permissible peaceful demonstration is a far cry from allowing one to commit, for example, murder, or robbery.[3]

The record here clearly shows that the officials present gave permission for the demonstration to take place across the street from the courthouse. Cox testified that they gave him permission to conduct the demonstration

---

[3] See American Law Institute, Model Penal Code § 2.04 (3) (b) and comment thereon, Tentative Draft No. 4, pp. 17–18, 138–139; Hall and Seligman, Mistake of Law and *Mens Rea,* 8 U. Chi. L. Rev. 641, 675–677 (1941); *People* v. *Ferguson,* 134 Cal. App. 41, 24 P. 2d 965.

on the far side of the street. This testimony is not only uncontradicted but is corroborated by the State's witnesses who were present. Police Chief White testified that he told Cox "he must confine" the demonstration "to the west side of the street." [4] James Erwin, news director of radio station WIBR, agreed that Cox was given permission for the assembly as long as it remained within a designated time. When Sheriff Clemmons sought to break up the demonstration, he first announced, "now, you have been allowed to demonstrate." [5] The Sheriff testified that he had "no objection" to the students "being assembled on that side of the street." Finally, in its brief before this Court, the State did not contend t... .t permission was not granted. Rather in its statement of the facts and argument it conceded that the officials gave Cox and his group some time to demonstrate across the street from the courthouse. This agreement by the State that in fact permission had been granted to demonstrate across the street from the courthouse—at least for a limited period of time, which the State contends was set at seven minutes—was confirmed by counsel for the State in oral argument before this Court.

The record shows that at no time did the police recommend, or even suggest, that the demonstration be held further from the courthouse than it actually was. The police admittedly had prior notice that the demonstration was planned to be held in the vicinity of the courthouse. They were prepared for it at that point and so stationed themselves and their equipment as to keep the demonstrators on the far side of the street. As Cox approached

---

[4] It is true that the Police Chief testified that he did not subjectively intend to grant permission, but there is no evidence at all that this subjective state of mind was ever communicated to appellant, or in fact to anyone else present.

[5] See p. 572, *infra*, for the Sheriff's full statement at this time.

the vicinity of the courthouse, he was met by the Chief of Police and other officials. At this point not only was it not suggested that they hold their assembly elsewhere, or disband, but they were affirmatively told that they could hold the demonstration on the sidewalk of the far side of the street, 101 feet from the courthouse steps. This area was effectively blocked off by the police and traffic rerouted.

Thus, the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did, 101 feet from the courthouse steps, but could not meet closer to the courthouse. In effect, appellant was advised that a demonstration at the place it was held would not be one "near" the courthouse within the terms of the statute.

In *Raley v. Ohio*, 360 U. S. 423, this Court held that the Due Process Clause prevented conviction of persons for refusing to answer questions of a state investigating commission when they relied upon assurances of the commission, either express or implied, that they had a privilege under state law to refuse to answer, though in fact this privilege was not available to them. The situation presented here is analogous to that in *Raley*, which we deem to be controlling. As in *Raley*, under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could "would be to sanction an indefensible sort of entrapment by the State— convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *Id.*, at 426. The Due Process Clause does not permit convictions to be obtained under such circumstances.

This is not to say that had the appellant, entirely on his own, held the demonstration across the street from the courthouse within the sight and hearing of those

inside, or *a fortiori*, had he defied an order of the police requiring him to hold this demonstration at some point further away out of the sight and hearing of those inside the courthouse, we would reverse the conviction as in this case. In such cases a state interpretation of the statute to apply to the demonstration as being "near" the courthouse would be subject to quite different considerations. See p. 568, *supra*.

There remains just one final point: the effect of the Sheriff's order to disperse. The State in effect argues that this order somehow removed the prior grant of permission and reliance on the officials' construction that the demonstration on the far side of the street was not illegal as being "near" the courthouse. This, however, we cannot accept. Appellant was led to believe that his demonstration on the far side of the street violated no statute. He was expressly ordered to leave, not because he was peacefully demonstrating too near the courthouse, nor because a time limit originally set had expired, but because officials erroneously concluded that what he said threatened a breach of the peace. This is apparent from the face of the Sheriff's statement when he ordered the meeting dispersed: "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." See discussion in No. 24, *ante,* at 545–551. Appellant correctly conceived, as we have held in No. 24, *ante,* that this was not a valid reason for the dispersal order. He therefore was still justified in his continued belief that because of the original official grant of permission he had a right to stay where he was for the few additional minutes required to conclude the meeting. In addition, even if we were to accept the State's version that the sole reason for terminating the demonstration

was that appellant exceeded the narrow time limits [6] set by the police, his conviction could not be sustained. Assuming the place of the meeting was appropriate—as appellant justifiably concluded from the official grant of permission—nothing in this courthouse statute, nor in the breach of the peace or obstruction of public passages statutes with their broad sweep and application that we have condemned in No. 24, *ante,* at 553–558, authorizes the police to draw the narrow time line, unrelated to any policy of these statutes, that would be approved if we were to sustain appellant's conviction on this ground. Indeed, the allowance of such unfettered discretion in the police would itself constitute a procedure such as that condemned in No. 24, *ante,* at 553–558. In any event, as we have stated, it is our conclusion from the record that the dispersal order had nothing to do with any time or place limitation, and thus, on this ground alone, it is clear that the dispersal order did not remove the protection accorded appellant by the original grant of permission.

Of course this does not mean that the police cannot call a halt to a meeting which though originally peaceful, becomes violent. Nor does it mean that, under properly drafted and administered statutes and ordinances, the authorities cannot set reasonable time limits for assemblies related to the policies of such laws and then order them dispersed when these time limits are exceeded. See the discussion in No. 24, *ante,* at 553–558. We merely hold that, under circumstances such as those present in this case, appellant's conviction cannot be sustained on the basis of the dispersal order.

---

[6] As we have pointed out in No. 24, *ante,* at 541, n. 2, the evidence is conflicting as to whether appellant and his group were given only a limited time to hold their meeting and whether, if so, such a time limit was exceeded.

Nothing we have said here or in No. 24, *ante*, is to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interests in private and public property, or protect the administration of justice and other essential governmental functions.

Liberty can only be exercised in a system of law which safeguards order. We reaffirm the repeated holdings of this Court that our constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society. We also reaffirm the repeated decisions of this Court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations. There is an equally plain requirement for laws and regulations to be drawn so as to give citizens fair warning as to what is illegal; for regulation of conduct that involves freedom of speech and assembly not to be so broad in scope as to stifle First Amendment freedoms, which "need breathing space to survive," *NAACP* v. *Button*, 371 U. S. 415, 433; for appropriate limitations on the discretion of public officials where speech and assembly are intertwined with regulated conduct; and for all such laws and regulations to be applied with an equal hand. We believe that all of these requirements can be met in an ordered society dedicated to liberty. We reaffirm our conviction that "[f]reedom and viable government

are . . . indivisible concepts." *Gibson* v. *Florida Legislative Comm.*, 372 U. S. 539, 546.

The application of these principles requires us to reverse the judgment of the Supreme Court of Louisiana.

*Reversed.*

MR. JUSTICE BLACK, concurring in No. 24 and dissenting in No. 49.

I concur in the Court's judgment reversing appellant Cox's convictions for violation of the Louisiana statutes prohibiting breach of the peace and obstructing public passages, but I do so for reasons which differ somewhat from those stated in the Court's opinion. I therefore deem it appropriate to state separately my reasons for voting to hold both these statutes unconstitutional and to reverse the convictions under them. On the other hand, I have no doubt that the State has power to protect judges, jurors, witnesses, and court officers from intimidation by crowds which seek to influence them by picketing, patrolling, or parading in or near the courthouses in which they do their business or the homes in which they live, and I therefore believe that the Louisiana statute which protects the administration of justice by forbidding such interferences is constitutional, both as written and as applied. Since I believe that the evidence showed practically without dispute that appellant violated this statute, I think this conviction should be affirmed.

There was ample evidence for the jury to have found the following to be the facts: On December 14, 1961, 23 persons were arrested and put in jail on a charge of illegal picketing. That night appellant Cox and others made plans to carry on a "demonstration," that is, a parade and march, through parts of Baton Rouge, ending at the courthouse. Their purpose was to "protest"

against what they called the "illegal arrest" of the 23 picketers. They neither sought nor obtained any permit for such a use of the streets. The next morning, December 15, the plan was carried out. Some 2,000 protesters marched to a point 101 feet across the street from the courthouse, which also contained the jail. State and county police officers, for reasons as to which there was a conflict in the evidence from which different inferences could be drawn, agreed that the picketers might stay there for a few minutes. The group sang songs along with the prisoners in the jail and did other things set out in the Court's opinion. Later state and county officials told Cox, the group's leader, that the crowd had to "move on." Cox told his followers to stay where they were and they did. Officers then used tear gas and the picketers ran away. Cox was later arrested.

## I. THE BREACH-OF-PEACE CONVICTION.

I agree with that part of the Court's opinion holding that the Louisiana breach-of-the-peace statute [1] on its face and as construed by the State Supreme Court is so broad

---

[1] La. Rev. Stat. § 14:103.1 (Cum. Supp. 1962) provides in relevant part:

"Whoever with intent to provoke a breach-of-the-peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) crowds or congregates with others, providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions, in or upon . . . a public street or public highway, or upon a public sidewalk, or any other public place or building . . . and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or parish, in which such act or acts are committed, or by any law enforcement officer of the state of Louisiana, or any other authorized person . . . shall be guilty of disturbing the peace. . . ."

as to be unconstitutionally vague under the First and Fourteenth Amendments. See *Winters* v. *New York*, 333 U. S. 507, 509–510. The statute does not itself define the conditions upon which people who want to express views may be allowed to use the public streets and highways, but leaves this to be defined by law enforcement officers. The statute therefore neither forbids all crowds to congregate and picket on streets, nor is it narrowly drawn to prohibit congregating or patrolling under certain clearly defined conditions while preserving the freedom to speak of those who are using the streets as streets in the ordinary way that the State permits. A state statute of either of the two types just mentioned, regulating *conduct*—patrolling and marching—as distinguished from *speech,* would in my judgment be constitutional, subject only to the condition that if such a law had the effect of indirectly impinging on freedom of speech, press, or religion, it would be unconstitutional if under the circumstances it appeared that the State's interest in suppressing the conduct was not sufficient to outweigh the individual's interest in engaging in conduct closely involving his First Amendment freedoms. As this Court held in *Schneider* v. *State,* 308 U. S. 147, 161:

> "Mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights."

See also, *e. g., Brotherhood of R. Trainmen* v. *Virginia ex rel. Virginia State Bar,* 377 U. S. 1; *NAACP* v. *Button,* 371 U. S. 415; *NAACP* v. *Alabama ex rel. Patterson,* 357

U. S. 449; *Martin* v. *City of Struthers,* 319 U. S. 141; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Lovell* v. *City of Griffin,* 303 U. S. 444; *Grosjean* v. *American Press Co.,* 297 U. S. 233. As I discussed at length in my dissenting opinion in *Barenblatt* v. *United States,* 360 U. S. 109, 141–142, when passing on the validity of a regulation of conduct, which may *indirectly* infringe on free speech, this Court does, and I agree that it should, "weigh the circumstances" in order to protect, not to destroy, freedom of speech, press, and religion.

The First and Fourteenth Amendments, I think, take away from government, state and federal, all power to restrict freedom of speech, press, and assembly *where people have a right to be for such purposes.* This does not mean, however, that these amendments also grant a constitutional right to engage in the conduct of picketing or patrolling, whether on publicly owned streets or on privately owned property. See *Labor Board* v. *Fruit & Vegetable Packers & Warehousemen,* 377 U. S. 58, 76 (concurring opinion). Were the law otherwise, people on the streets, in their homes and anywhere else could be compelled to listen against their will to speakers they did not want to hear. Picketing, though it may be utilized to communicate ideas, is not speech, and therefore is not of itself protected by the First Amendment. *Hughes* v. *Superior Court,* 339 U. S. 460, 464–466; *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490; *Bakery & Pastry Drivers & Helpers* v. *Wohl,* 315 U. S. 769, 775–777 (DOUGLAS, J., concurring).

However, because Louisiana's breach-of-peace statute is not narrowly drawn to assure nondiscriminatory application, I think it is constitutionally invalid under our holding in *Edwards* v. *South Carolina,* 372 U. S. 229. See also *Musser* v. *Utah,* 333 U. S. 95, 96–97. *Edwards,* however, as I understand it, did not hold that either private property owners or the States are constitutionally re-

quired to supply a place for people to exercise freedom of speech or assembly. See *Bell* v. *Maryland,* 378 U. S. 226, 344–346 (dissenting opinion). What *Edwards* as I read it did hold, and correctly I think, was not that the Federal Constitution prohibited South Carolina from making it unlawful for people to congregate, picket, and parade on or near that State's capitol grounds, but rather that in the absence of a clear, narrowly drawn, nondiscriminatory statute prohibiting such gatherings and picketing, South Carolina could not punish people for assembling at the capitol to petition for redress of grievances. In the case before us Louisiana has by a broad, vague statute given policemen an unlimited power to order people off the streets, not to enforce a specific, nondiscriminatory state statute forbidding patrolling and picketing, but rather whenever a policeman makes a decision on his own personal judgment that views being expressed on the street are provoking or might provoke a breach of the peace.. Such a statute does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat. Compare *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369–370. This kind of statute provides a perfect device to arrest people whose views do not suit the policeman or his superiors, while leaving free to talk anyone with whose views the police agree. See *Feiner* v. *New York,* 340 U. S. 315, 321 (dissenting opinion); cf. *Peters* v. *Hobby,* 349 U. S. 331, 349–350 (concurring opinion); *Barsky* v. *Board of Regents,* 347 U. S. 442, 463–464 (dissenting opinion); *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 217–218 (dissenting opinion); *Ludecke* v. *Watkins,* 335 U. S. 160, 173 (dissenting opinion). In this situation I think *Edwards* v. *South Carolina* and other such cases invalidating statutes for vagueness are controlling. Moreover, because the statute makes an exception for labor organizations and therefore tries to limit access to

the streets to some views but not others, I believe it is unconstitutional for the reasons discussed in Part II of this opinion, dealing with the street-obstruction statute, *infra*. For all the reasons stated I concur in reversing the conviction based on the breach-of-peace statute.

## II. THE OBSTRUCTING-PUBLIC-PASSAGES CONVICTION.

The Louisiana law against obstructing the streets and sidewalks,[2] while applied here so as to convict Negroes for assembling and picketing on streets and sidewalks for the purpose of publicly protesting racial discrimination, expressly provides that the statute shall not bar picketing and assembly by labor unions protesting unfair treatment of union members. I believe that the First and Fourteenth Amendments require that if the streets of a town are open to some views, they must be open to all. It is worth noting in passing that the objectives of labor unions and of the group led by Cox here may have much in common. Both frequently protest discrimination against their members in the matter of employment. Compare *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552, 561. This Louisiana law opens the streets for union assembly, picketing, and

---

[2] La. Rev. Stat. § 14:100.1 (Cum. Supp. 1962) provides in relevant part:

"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

"Providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions. . . ."

public advocacy, while denying that opportunity to groups protesting against racial discrimination. As I said above, I have no doubt about the general power of Louisiana to bar all picketing on its streets and highways. Standing, patrolling, or marching back and forth on streets is conduct, not speech, and as conduct can be regulated or prohibited. But by specifically permitting picketing for the publication of labor union views, Louisiana is attempting to pick and choose among the views it is willing to have discussed on its streets. It thus is trying to prescribe by law what matters of public interest people whom it allows to assemble on its streets may and may not discuss. This seems to me to be censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments. And to deny this appellant and his group use of the streets because of their views against racial discrimination, while allowing other groups to use the streets to voice opinions on other subjects, also amounts, I think, to an invidious discrimination forbidden by the Equal Protection Clause of the Fourteenth Amendment.[3] Moreover, as the Court points out, city officials despite this statute apparently have permitted favored groups other than labor unions to block the streets with their gatherings. For these reasons I concur in reversing the conviction based on this law.

### III. THE CONVICTION FOR PICKETING NEAR A COURTHOUSE.

I would sustain the conviction of appellant for violation of Louisiana's Rev. Stat. § 14:401 (Cum. Supp. 1962), which makes it an offense for anyone, under any condi-

---

[3] It is of interest that appellant Cox, according to a state witness, said this about the reason his group picketed the courthouse: "[H]e said that in effect that it was a protest against the illegal arrest of some of their members and that other people were allowed to picket and that they should have the right to picket . . . ."

tions, to picket or parade near a courthouse, residence or other building used by a judge, juror, witness, or court officer, "with the intent of influencing" any of them.[4] Certainly the record shows beyond all doubt that the purpose of the 2,000 or more people who stood right across the street from the courthouse and jail was to protest the arrest of members of their group who were then in jail. As the Court's opinion states, appellant Cox so testified. Certainly the most obvious reason for their protest at the courthouse was to influence the judge and other court officials who used the courthouse and performed their official duties there. The Court attempts to support its holding by its inference that the Chief of Police gave his consent to picketing the courthouse. But quite apart from the fact that a police chief cannot authorize violations of his State's criminal laws,[5] there was strong, emphatic testimony that if any consent was given it was limited to telling Cox and his group to come no closer to the courthouse than they had already come without the consent of any official, city, state, or federal. And there was also testimony that when told to leave appellant Cox defied the order by telling the crowd not to move. I fail to understand how the Court can justify the reversal of this con-

---

[4] La. Rev. Stat. § 14:401 (Cum. Supp. 1962) provides in relevant part:

"Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana, or in or near a building or residence occupied or used by such judge, juror, witness, or court officer, or with such intent uses any sound-truck or similar device or resorts to any other demonstration in or near any such building or residence, shall be fined not more than five thousand dollars or imprisoned not more than one year, or both. . . ."

[5] Cf. *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–352; *California* v. *Federal Power Comm'n*, 369 U. S. 482, 484–485; *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 225–227.

viction because of a permission which testimony in the record denies was given, which could not have been authoritatively given anyway, and which even if given was soon afterwards revoked. While I agree that the record does not show boisterous or violent conduct or indecent language on the part of the "demonstrators," the ample evidence that this group planned the march on the courthouse and carried it out for the express purpose of influencing the courthouse officials in the performance of their official duties brings this case squarely within the prohibitions of the Louisiana statute and I think leaves us with no alternative but to sustain the conviction unless the statute itself is unconstitutional, and I do not believe that this statute is unconstitutional, either on its face or as applied.

This statute, like the federal one which it closely resembles,[6] was enacted to protect courts and court officials from the intimidation and dangers that inhere in huge gatherings at courthouse doors and jail doors to protest arrests and to influence court officials in performing their duties. The very purpose of a court system is to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures. Justice cannot be rightly administered, nor are the lives and safety of prisoners secure, where throngs of people clamor against the processes of justice right outside the courthouse or jailhouse doors. The streets are not now and never have been the proper place to administer justice. Use of the streets for such purposes has always proved disastrous to individual liberty in the long run, whatever fleeting benefits may have appeared to have been achieved. And minority groups, I venture to suggest, are the ones who always have suffered and always will suffer most when street multitudes are allowed to sub-

---

[6] 18 U. S. C. § 1507 (1958 ed.).

stitute their pressures for the less glamorous but more dependable and temperate processes of the law. Experience demonstrates that it is not a far step from what to many seems the earnest, honest, patriotic, kind-spirited multitude of today, to the fanatical, threatening, lawless mob of tomorrow. And the crowds that press in the streets for noble goals today can be supplanted tomorrow by street mobs pressuring the courts for precisely opposite ends.

Minority groups in particular need always to bear in mind that the Constitution, while it requires States to treat all citizens equally and protect them in the exercise of rights granted by the Federal Constitution and laws, does not take away the State's power, indeed its duty, to keep order and to do justice according to law. Those who encourage minority groups to believe that the United States Constitution and federal laws give them a right to patrol and picket in the streets whenever they choose, in order to advance what they think to be a just and noble end, do no service to those minority groups, their cause, or their country. I am confident from this record that this appellant violated the Louisiana statute because of a mistaken belief that he and his followers had a constitutional right to do so, because of what they believed were just grievances. But the history of the past 25 years if it shows nothing else shows that his group's constitutional and statutory rights have to be protected by the courts, which must be kept free from intimidation and coercive pressures of any kind. Government under law as ordained by our Constitution is too precious, too sacred, to be jeopardized by subjecting the courts to intimidatory practices that have been fatal to individual liberty and minority rights wherever and whenever such practices have been allowed to poison the streams of justice. I would be wholly unwilling to join in moving this country a single step in that direction.

Mr. Justice Clark, concurring in No. 24 and dissenting in No. 49.

According to the record, the opinions of all of Louisiana's courts and even the majority opinion of this Court, the appellant, in an effort to influence and intimidate the courts and legal officials of Baton Rouge and procure the release of 23 prisoners being held for trial, agitated and led a mob of over 2,000 students in the staging of a modern Donnybrook Fair across from the courthouse and jail. He preferred to resolve the controversy in the streets rather than submit the question to the normal judicial procedures by contacting the judge and attempting to secure bail and an early trial for the prisoners.

Louisiana's statute, § 14:401, under attack here, was taken *in haec verba* from a bill which became 18 U. S. C. § 1507 (1958 ed.). The federal statute was enacted by the Congress in 1950 to protect federal courts from demonstrations similar to the one involved in this case. It applies to the Supreme Court Building where this Court sits. I understand that § 1507 was written by members of this Court after disturbances similar to the one here occurred at buildings housing federal courts. Naturally, the Court could hardly be expected to hold its progeny invalid either on the ground that the use in the statute of the phrase "in or near a building housing a court" was vague or that it violated free speech or assembly. It has been said that an author is always pleased with his own work.

But the Court excuses Cox's brazen defiance of the statute—the validity of which the Court upholds—on a much more subtle ground. It seizes upon the acquiescence of the Chief of Police arising from the laudable motive to avoid violence and possible bloodshed to find that he made an on-the-spot administrative determination that a demonstration confined to the west side of

St. Louis Street—101 feet from the courthouse steps—would not be "near" enough to the court building to violate the statute. It then holds that the arrest and conviction of appellant for demonstrating there constitutes an "indefensible sort of entrapment," citing *Raley* v. *Ohio*, 360 U. S. 423 (1959).

With due deference, the record will not support this novel theory. Nor is *Raley* apposite. This mob of young Negroes led by Cox—2,000 strong—was not only within sight but in hearing distance of the courthouse. The record is replete with evidence that the demonstrators with their singing, cheering, clapping and waving of banners drew the attention of the whole courthouse square as well as the occupants and officials of the court building itself. Indeed, one judge was obliged to leave the building. The 23 students who had been arrested for sit-in demonstrations the day before and who were in custody in the building were also aroused to such an extent that they sang and cheered to the demonstrators from the jail which was in the courthouse and the demonstrators returned the notice with like activity. The law enforcement officials were confronted with a direct obstruction to the orderly administration of their duties as well as an interference with the courts. One hardly needed an on-the-spot administrative decision that the demonstration was "near" the courthouse with the disturbance being conducted before the eyes and ringing in the ears of court officials, police officers and citizens throughout the courthouse.

Moreover, the Chief testified that when Cox and the 2,000 Negroes approached him on the way to the courthouse he was faced with a "situation that was accomplished." From the beginning they had been told not to proceed with their march; twice officers had requested them to turn back to the school; on each occasion they had refused. Finding that he could not stop them with-

out the use of force the Chief told Cox that he must confine the demonstration to the west side of St. Louis Street across from the courthouse.

All the witnesses, including the appellant, state that the time for the demonstration was expressly limited. The State's witnesses say seven minutes, while Cox claims his speech was to be seven minutes but the program would take from 17 to 25 minutes. Regardless of the amount of time agreed upon, it is a novel construction of the facts to say that the grant of permission to demonstrate for a limited period of time was an administrative determination that the west side of the street was not "near" the courthouse. This implies that the amount of time might somehow be relevant in deciding whether an activity is within the prohibitions of the statute. The inclusion of a time limitation is, to me, entirely inconsistent with the view that an administrative determination was made. The only way the Court can support its finding is to ignore the time limitation and hold—as it does *sub silentio*—that once Cox and the 2,000 demonstrators were permitted to occupy the sidewalk they could remain indefinitely. Once the administrative determination was made that the west side of St. Louis Street was not so close to the courthouse as to violate the statute it could not be later drawn within the prohibited zone by Cox's refusal to leave. Thus the 2,000 demonstrators must be allowed to remain there unless in the meanwhile some other statute empowers the State to eject them. This, I submit, is a complete frustration of the power of the State.

Because I am unable to agree that the word "near," when applied to the facts of this case, required an administrative interpretation, and since I feel that the record refutes the conclusion that it was made, I must respectfully dissent from such a finding.

Nor can I follow the Court's logic when it holds that the case is controlled by *Raley* v. *Ohio, supra.* In *Raley* the petitioners whose convictions were reversed were told that they had a right to exercise their privilege and refuse to answer questions propounded to them in an orderly way during the conduct of a hearing. The administrative determination upon which this Court turns the present case was in actuality made, if at all, in the heat of a racial demonstration in a southern city for the sole purpose of avoiding what had the potentialities of a race riot. In *Raley*, there was no large crowd of 2,000 demonstrators endangering a tenuous racial peace. Indeed, the petitioners in *Raley* might well have chosen to waive their privilege and not be subject to prosecution at all but for the advice tendered them by those conducting the hearing. Here the demonstrators were determined to go to the courthouse regardless of what the officials told them regarding the legality of their acts. Here, like the one petitioner in *Raley* whose conviction was affirmed by an equally divided Court, appellant never relied on the advice or determination of the officer. The demonstration, as I have previously noted, was a *fait accompli.* In view of these distinctions, I can see no enticement or encouragement by agents of the State sufficient to establish a *Raley*-type entrapment.

And even though *arguendo* one admits that the Chief's action was an administrative determination, I cannot see how the Court can hold it binding on the State. It certainly was not made in the free exercise of his discretion.

Reading the facts in a way most favorable to the appellant would, in my opinion, establish only that the Chief of Police consented to the demonstration at that location. However, if the Chief's action be consent, I never knew until today that a law enforcement official—city, state or national—could forgive a breach of the criminal laws. I missed that in my law school, in my practice and for

the two years while I was head of the Criminal Division of the Department of Justice.

I have always been taught that this Nation was dedicated to freedom *under law* not under mobs, whether they be integrationists or white supremacists. Our concept of equal justice under law encompasses no such protection as the Court gives Cox today. The contemporary drive for personal liberty can only be successful when conducted within the framework of due process of law. Goals, no matter how laudable, pursued by mobocracy in the end must always lead to further restraints of free expression. To permit, and even condone, the use of such anarchistic devices to influence the administration of justice can but lead us to disaster. For the Court to place its imprimatur upon it is a misfortune that those who love the law will always regret.

I must, therefore, respectfully dissent from this action and join my Brother BLACK on this facet of the case. I also agree with him that the statute prohibiting obstruction of public passages is invalid under the Equal Protection Clause.[1] And, as will be seen, I arrive at the same conclusion for the same reason on the question regarding the breach of the peace statute. However, I cannot agree that the latter Act is unconstitutionally vague.

The statute declares congregating "with intent to provoke a breach of the peace" and refusing to disperse after being ordered so to do by an officer to be an offense. Each of these elements is set out in clear and unequivocal language. Certainly the language in the present statute is no more vague than that in the New York statute which was challenged on vagueness grounds in *Feiner* v. *New York*, 340 U. S. 315.[2] There the Court upheld

---

[1] See Parts I and II of his opinion.

[2] Section 722 of the Penal Law of New York in effect at that time stated:

"Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of

Feiner's conviction on a disorderly conduct charge. I concur completely in the Court's statement that the present case is a "far cry from the situation" presented in *Feiner:*

> "There the demonstration was conducted by only one person and the crowd was limited to approximately 80, as compared with the present lineup of some [2,000] demonstrators and [250] onlookers. . . . Perhaps [appellant's] speech was not so animated but in this setting their actions . . . created a much greater danger of riot and disorder. It is my belief that anyone conversant with the almost spontaneous combustion in some Southern communities in such a situation will agree that the [Sheriff's] action may well have averted a major catastrophe." *Edwards v. South Carolina,* 372 U. S. 229, 243–244 (dissenting opinion of CLARK, J.).

Nor can I agree that the instant case is controlled by either *Edwards* v. *South Carolina, supra,* or *Fields* v. *South Carolina,* 375 U. S. 44 (1963). Both went off on their peculiar facts and neither dealt with a situation like the one here before the Court. Moreover, *Edwards* and *Fields* involved convictions for common-law breach of the peace and not violation of a statute.

In any event, I believe the language of the breach of the peace statute is as free from ambiguity or vagueness

the following acts shall be deemed to have committed the offense of disorderly conduct:

"1. Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior;

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others;

"3. Congregates with others on a public street and refuses to move on when ordered by the police;

"4. By his actions causes a crowd to collect, except when lawfully addressing such a crowd."

as is the statute prohibiting picketing of a courthouse which the Court today upholds. There the relevant words are parading "in or near a building housing a court of the State . . ." with the intent of obstructing justice. Certainly, both of the statutes are as clear as the words "below cost" which this Court approved in *United States v. National Dairy Products,* 372 U. S. 29 (1963), and cases there cited.

However, because this statute contains an express exclusion for the activities of labor unions, I would hold the statute unconstitutional on the equal protection ground my Brother BLACK enunciated with regard to the statute condemning obstruction of public passages.

On these grounds I dissent.

MR. JUSTICE WHITE, with whom MR. JUSTICE HARLAN joins, concurring in part and dissenting in part.

In No. 49, I agree with the dissent filed by my Brother BLACK in Part III of his opinion. In No. 24, although I do not agree with everything the Court says concerning the breach of peace conviction, particularly its statement concerning the unqualified protection to be extended to Cox's exhortations to engage in sit-ins in restaurants, I agree that the conviction for breach of peace is governed by *Edwards v. South Carolina,* 372 U. S. 229, and must be reversed.

Regretfully, I also dissent from the reversal of the conviction for obstruction of public passages. The Louisiana statute is not invalidated on its face but only in its application. But this remarkable emasculation of a prohibitory statute is based on only very vague evidence that other meetings and parades have been allowed by the authorities. The sole indication in the record from the state court that such has occurred was contained in the testimony of the Chief of Police who, in the process of

pointing out that Cox and his group had not announced the fact or purpose of their meeting, said "most organizations that want to hold a parade or a meeting of any kind, they have no reluctance to evidence their desires at the start." There is no evidence in the record that other meetings of this magnitude had been allowed on the city streets, had been allowed in the vicinity of the courthouse or had been permitted completely to obstruct the sidewalk and to block access to abutting buildings. Indeed, the sheriff testified that "we have never had such a demonstration since I have been in law enforcement in this parish." He also testified that "any other organization" would have received the same treatment if it "had conducted such a demonstration in front of the Parish Courthouse," whether it had been "colored or white, Protestant, Catholic, Jewish, any kind of organization, if they had conducted this same type of demonstration . . . ." Similarly the trial judge noted that although Louisiana respects freedom of speech and the right to picket, Louisiana courts "have held that picketing is unlawful when it is mass picketing."

At the oral argument in response to MR. JUSTICE GOLD-BERG's question as to whether parades and demonstrations are allowed in Baton Rouge, counsel said, "arrangements are usually made depending on the size of the demonstration, of course, arrangements are made with the officials and their cooperation is not only required it is needed where you have such a large crowd." In my view, however, all of this evidence together falls far short of justification for converting this prohibitory state statute into an open-ended licensing statute invalid under prior decisions of this Court as applied to this case. This is particularly true since the Court's approach is its own invention and has not been urged or litigated by the parties either in this Court or the courts below.

Certainly the parties have had no opportunity to develop or to refute the factual basis underlying the Court's rationale.

Under the Court's broad, rather uncritical approach it would seem unavoidable that these same demonstrators could have met in the middle of any street during the rush hour or could have extended their meeting at any location hour after hour, day after day, without risking any action under this statute for interfering with the normal use of the streets and sidewalks. I doubt that this bizarre intrusion into local management of public streets is either required or justified by the prior cases in this Court.

Furthermore, even if the obstruction statute, because of prior permission granted to others, could not be applied in this case so as to prevent the demonstration, it does not necessarily follow that the federal license to use the streets is unlimited as to time and circumstance. Two thousand people took possession of the sidewalk in an entire city block. Building entrances were blocked and normal use of the sidewalk was impossible. If the crowd was entitled to obstruct in order to demonstrate as the Court holds, it is nevertheless unnecessary to hold that the demonstration and the obstruction could continue *ad infinitum*. Here the demonstration was permitted to proceed for the period of time that the demonstrators had requested. When they were asked to disband, Cox twice refused. If he could refuse at this point I think he could refuse at any later time as well. But in my view at some point the authorities were entitled to apply the statute and to clear the streets. That point was reached here. To reverse the conviction under these circumstances makes it only rhetoric to talk of local power to control the streets under a properly drawn ordinance.