**UNITED STATES of America, Appellee,**

v.

**Larry Henry CARTER, Appellant.**

**No. 83–1204.**

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1983.

Decided Sept. 29, 1983.

Jon T. Griffin, Des Moines, Iowa, for appellant.

Richard C. Turner, U.S. Atty., George W. Murray, Asst. U.S. Atty., Des Moines, Iowa, for appellee.

Before LAY, Chief Judge, BROWN,* Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

Larry Henry Carter was convicted by a jury of demonstrating near the United States Courthouse in Des Moines, Iowa, with the intent of interfering with the administration of justice and influencing a judge, juror, witness, or court officer in the discharge of his duty, in violation of 18 U.S.C. § 1507.[1] The demonstration, which included between 150 and 200 people, took place on the morning of October 27, 1982, the day of the trial of Gary John Eklund for failing to register for the military draft.[2] The District Court[3] sentenced Carter to six months' probation, on condition that he perform 40 hours of voluntary public service under the direction of the probation office.

---

* The Hon. Bailey Brown, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. § 1507. Picketing or parading
   Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty, pickets or parades in or near a building housing a court of the United States, or in or near a building or residence occupied or used by such judge, juror, witness, or court officer, or with such intent uses any sound-truck or similar device or resorts to any other demonstration in or near any such building or residence, shall be fined not more than $5,000 or imprisoned not more than one year, or both.
   Nothing in this section shall interfere with or prevent the exercise by any court of the United States of its power to punish for contempt. Added Sept. 23, 1950, c. 1024, Title I, § 31(a), 64 Stat. 1018.

2. Eklund was convicted, and his appeal is now pending before this Court en banc. No. 82–2505, argued September 2, 1983.

3. The Hon. R.E. Longstaff, United States Magistrate for the Southern District of Iowa, presided at the trial of this misdemeanor prosecution. See 28 U.S.C. § 636(a)(3); 18 U.S.C. § 3401(a).

Carter did not urge in the District Court, and he does not now argue to us, that 18 U.S.C. § 1507, as applied to his conduct is unconstitutional under the First Amendment. A Louisiana statute modeled on the bill that later became § 1507 was held valid on its face and as applied to the conduct then before the Court in *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). We do not know why defendant raises no First Amendment issue, and we express no view on the question of the validity of § 1507 as applied to the conduct revealed by this record.[4]

Carter's principal argument on appeal is that there was insufficient evidence of an intention on his part either to interfere with the administration of justice or to influence any participant in the Eklund trial. The District Court should therefore, he says, have directed a verdict of acquittal in his favor. We have carefully examined the transcript of the trial. It is our duty, when considering an argument that evidence was insufficient to make a jury question, to view the evidence in the light most favorable to the United States, and to give the prosecution the benefit of every reasonable inference. Applying that standard, we cannot in good conscience say that the evidence of Carter's intent was legally insufficient, and we therefore affirm the judgment of conviction.

## I.

The Government's only witness at trial was Charlie Walters, Chief Deputy United States Marshal for the Southern District of Iowa. He testified that a group of "protesters" got in touch with him on September 30, 1982, a little less than a month before the Eklund trial, and informed him that "their intention was to demonstrate at the U.S. Courthouse on the date that Mr. Eklund was to be tried," and that "they would attempt to blockade the courthouse." Tr. 5. On October 5, 1982, at another meeting between members of the protest group and the Marshals Service, "[w]e were informed ... that their intent for this demonstration was to interfere with the normal procedures of the courthouse by attempting to blockade the courthouse on the day that Mr. Gary Eklund was to go to trial." Tr. 7. At this meeting, the Marshals Service and the protest group agreed that a line would be drawn on the sidewalk leading to the west door of the courthouse. The line would be at the boundary between city and federal property. Marshals were stationed along the line on the federal side to ensure that "that area remained clear so we could admit who we deemed necessary on that particular day." Tr. 19. The Marshals Service and the protest group agreed that anyone who crossed the line would be asked to leave. Those who did not leave would be arrested for violation of 18 U.S.C. § 1507.

We digress for a moment to offer a comment on this line-drawing procedure. It may seem strange for federal officers and demonstrators to meet in advance and make such an arrangement. Those who plan to violate the law do not normally give advance notice and confer with the police about the procedures for their arrest. The statute, moreover, says nothing about white chalk lines drawn around courthouses, nor does any element of this crime turn on who has title to the land on which the demonstration occurs. We think there were nonetheless good reasons for the conferences that were held in this case. In the first

---

4. In *United States v. Grace,* —— U.S. ——, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), the Supreme Court held unconstitutional on its face that portion of 40 U.S.C. § 13k that purports to forbid the "display [of] any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement" on the public sidewalks on the grounds of the Supreme Court. The crucial difference between that statute and 18 U.S.C. § 1507 is precisely the element of intent, the Government's proof of which is the main question now before us. Title 40 U.S.C. § 13k did not require, as an element of the crime there defined, that the defendant intend to interfere with the administration of justice or to influence any judge or juror. It attempted to make criminal the simple display of a flag, banner, or device of a certain type, whether or not the defendant wished to influence the courts or obstruct the administration of justice.

place, the statute is not precisely limited in spatial terms. It speaks only of picketing, parading, or demonstrating "in or near" a courthouse. In fact, in some situations a statutory term like "near" might cause the law to be unconstitutionally vague. It was reasonable, therefore, and beneficial for both sides for the marshals to give the word "near" definite content by marking out those areas where a federal arrest would take place, and those areas where it would not. Just such an "on-the-spot administrative interpretation by officials charged with responsibility for administering and enforcing" the law was expressly approved by the Supreme Court in *Cox v. Louisiana, supra,* 379 U.S. at 568, 85 S.Ct. at 483. "This administrative discretion to construe the term 'near' concerns a limited control of the streets and other areas in the immediate vicinity of the courthouse and is the type of narrow discretion which this Court has recognized as the proper role of responsible officials in making determinations concerning the time, place, duration, and manner of demonstrations." *Id.* at 569, 85 S.Ct. at 483.

This kind of advance arrangement, then, eliminates uncertainty on both sides. The protest group knew what it would take either to avoid or to provoke a federal arrest. Some of them did not want to violate any law, but others "felt that they must be arrested to demonstrate that they felt that the Eklund trial was a political trial, and they did not feel that it should take place." Tr. 8–9 (testimony of Mr. Walters). Probably it was thought (no doubt rightly) that getting arrested by federal officers would create more publicity. And the Marshals Service had some assurance that the actions of the demonstrators would be predictable and not involve violence offered to any other person. This assurance turned out to be well-founded. The demonstration was entirely peaceful, and there was in fact no interference with the trial or with the other operations of the courthouse. For this both the Marshals Service and the protesters, who are, whatever the legality of their ac-

tions, citizens of the United States with sincere and deeply held beliefs, deserve a measure of credit.

■ To return to our narrative: On the morning of October 27, 1982, about 150 or 200 demonstrators, carrying various signs and banners, assembled across the street from the courthouse, opposite the west door. Some of them crossed the street, and others, a smaller number, also crossed the white line that the Marshals Service had drawn. Carter was one of this latter group, which numbered about 20. They were asked to leave, refused, and were arrested. There was no abusive language on anyone's part. Some of the people arrested (not including Carter) did not want to get up (they were sitting or lying on the sidewalk) and had to be carried off. But "[a]fter we got out of the way of the cameras they got up and walked" (Tr. 62).

The defendants, including Carter,[5] all insisted that they had no desire to interfere with the administration of justice or to influence any participant in the Eklund trial. Their intent, they said, was to get as much media exposure as possible in order, they hoped, to encourage the public to oppose draft registration, with the result, perhaps, of ultimately persuading Congress to repeal it. They knew that the judge, jury, and witnesses in the Eklund case were going to use another entrance to the courthouse, and that juries are normally shielded from publicity about the case they are trying. Those who were arrested were taken to a holding area right next to the courtroom where Eklund was being tried, but did not cry out or attempt to disrupt the trial. The protesters could, if they wished, have kept their intentions quiet until the day of trial, obtained admission to the courtroom along with the general public, and demonstrated in the immediate presence of the court, if it had been their desire to try to obstruct the trial or influence its outcome. That they did not do so, it is said, is strong evidence that their intention was not illegitimate. The "blockade" that had been spo-

---

5. Carter was tried jointly with three other demonstrators.

ken of, they argue, was to be only "symbolic."

We might have accepted this version of the facts had we been on the jury, but we cannot agree that the defense was so strong, or the prosecution so weak, as to require a directed verdict of acquittal. The jury was not obliged to believe the defense protestations that the intent of the demonstration was solely to appeal to public opinion. It was at liberty to accept instead the Walters testimony that leaders of the protest group said they intended to blockade the courthouse and interfere with its normal procedures. No such blockade took place, but the jury could have found that the defendant intended to take part in it and would have done so had not a line of federal officers prevented him. In addition, the fact that the demonstration took place at the very time and place of the Eklund trial is grounds for an inference that the defendant intended to influence its outcome. A large sign held by members of the group across the street said, among other things, "Free Gary Eklund," and that sentiment is most naturally understood as being addressed to judge and jury, not to the voting public.

We are not without guidance in assessing the sufficiency of this proof. In *Cox* the Supreme Court addressed a similar issue. Mr. Justice Goldberg, speaking for the Court in a passage with which no Justice disagreed, said:

> Louisiana surely has the right to infer the appropriate intent from circumstantial evidence. At the very least, a group of demonstrators parading and picketing before a courthouse where a criminal charge is pending, in protest against the arrest of those charged, may be presumed to intend to influence judges, jurors, witnesses or court officials.

*Cox v. Louisiana, supra,* 379 U.S. at 567, 85 S.Ct. at 482. We assume that the word "presumed" in this passage is intended in the sense of a permissible inference rather

than an irrebuttable presumption in the literal sense. We note also that in *Cox* the Supreme Court was reviewing a state conviction under the old "no evidence" standard of *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). In order to sustain its position here, by contrast, the Government must show more than just some evidence of intent. It must show that there was enough evidence to justify a rational jury in concluding beyond a reasonable doubt that defendant intended to interfere with the administration of justice or to influence the outcome of the Eklund case. Still, the Supreme Court's *Cox* opinion emphasizes that circumstantial evidence of intent may be sufficient. And the evidence here was more than circumstantial. When Carter was arrested, he himself testified that he was part of a group saying "stop the political trials." The jury could have construed that phrase as simply a general expression of hope that no one would be tried in the future for failure to register. But it could also have understood Carter as calling for the halt of the Eklund trial itself, and that request would necessarily involve the influencing of the judge, or jury, or both. We have no doubt that the evidence of intent was legally sufficient.

We repeat the words of the Supreme Court[6] in *United States v. Grace,* 103 S.Ct. at 1710:

> the federal courts represent an independent branch of the Government and ... their decision-making processes are different from those of the other branches. Court decisions are made on the record before them and in accordance with the applicable law. The views of the parties and of others are to be presented by briefs and oral argument. Courts are not subject to lobbying, judges do not entertain visitors in their chambers for the purpose of urging that cases be resolved one way or another, and they do not and should not respond to parades, picketing

6. The Court was paraphrasing an argument made by the Government, but it did so with apparent approval.

or pressure groups. Neither ... should it *appear* to the public that the [courts are] subject to outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the [courts].

(Emphasis in original.) "The fact that by their lights appellant and the [other demonstrators] were seeking justice and not its obstruction is ... irrelevant ...." *Cox v. Louisiana, supra,* 379 U.S. at 567, 85 S.Ct. at 482.

## II.

We briefly discuss the three other arguments defendant makes for reversal.

■ 1. Defendant argues that he was entrapped, because he got in touch with the authorities to attempt to get precise instructions as to what behavior would be permitted and, as a result of discussions with law-enforcement officers and with Michael Sprong, the leader of the demonstration, he understood that the demonstration would not be unlawful. This argument is without merit. Entrapment, properly so called, is a defense to a criminal prosecution based on conduct that has been procured by the authorities themselves, and that the defendant was not predisposed to engage in. Here, Carter voluntarily engaged in the demonstration. He was not persuaded or induced to do so by any law-enforcement official. According to his own testimony, he first became aware that there would be a demonstration on October 25, two days before the event. He heard that there would be some arrests and called the Marshals' office to ask what the charge would be. He was told to call an attorney and replied that he did not have one. He was then told to contact Michael Sprong, who had been involved in the negotiations with the authorities. It may be true, as Carter testified, that he wanted to avoid doing anything that would be considered illegal, but he also testified that he attended a meeting the night before the demonstration and was told that anyone who ventured on the other side of the white chalk line would be subject to federal charges. This situation is a far cry from entrapment.

■ 2. Carter was tried on January 11, 1983. Between 1:30 and 3:00 p.m. on that day, members of the jury panel were together. Five or six panel members had also been panel members for the Eklund trial. Defendant claims that this intermingling of potential jurors subjected him to a fatal unfairness. We disagree. The District Court excused from the jury panel each prospective juror who had also been a member of the Eklund panel, and this action was taken before any of the defendants were called upon to exercise their peremptory challenges. Any claim of prejudice is therefore completely speculative.

■ 3. On the day before the trial, Carter's attorney, for reasons not fully explained, was allowed to withdraw, and his present counsel was appointed by the court to represent him. A motion for continuance was denied, and counsel now claims that his client was prejudiced by forcing him to go to trial with only one day of preparation. The denial of a continuance in this situation does seem somewhat abrupt. But counsel does not suggest anything specific that he would have done if he had been given more time. Counsel's examination of witnesses compares favorably with that of the lawyers representing other defendants, and we are not persuaded that the denial of a continuance, even if error, was prejudicial.

Affirmed.

It is so ordered.