668 A.2d 164

**COMMONWEALTH of Pennsylvania**

v.

**Anton B. SCHIERSCHER, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 19, 1995.

Filed Nov. 30, 1995.

62

64

Patrick F. Lauer, Jr., Camp Hill, for appellant.

Andrea F. McKenna, Deputy Attorney General, Harrisburg, for Commonwealth, appellee.

Before POPOVICH, SAYLOR and BROSKY, JJ.

POPOVICH, Judge:

The appellant, Anton B. Schierscher, appeals the judgment of sentence (aggregating 17–23 months imprisonment) for Threats and Other Improper Influences in Official and Political Matters, Retaliation for Past Official Action, Harassment, Stalking, Harassment by Communication or Address, and

Obstructing or Impeding the Administration of Justice by Picketing, etc. We affirm.

The facts, viewed in a light most favorable to the verdict winner and drawing all reasonable inferences therefrom, reveal that between March of 1993 and January of 1994, the appellant engaged in a course of conduct aimed at Judge Jeannine Turgeon of the Court of Common Pleas of Dauphin County having its genesis in a dispute involving the appellant (landlord) and two of his tenants (Morris and Butts). The matter ultimately reached the Common Pleas Court for resolution in de novo trials.

The *Morris* case was the first to be decided against the appellant's interest when he failed to appear for trial and an award of compensatory and punitive damages (totalling $7,500) was entered March 30, 1993. Likewise, the appellant failed to appear for the *Butts* case decided May 3, 1993, but he was awarded a majority of the rental money paid into escrow, with an abatement of rent to the tenant.

After the *Morris* ruling, the appellant embarked on a campaign of leaflet distribution in and outside the Dauphin County Courthouse, as well as an endless stream of phone calls to Judge Turgeon, other members of the local judiciary and County Commissioners, denouncing the judicial system in general and Judge Turgeon in particular as robbing him of money and seeking recoupment of this "theft" from Judge Turgeon.

This almost year-long saga of discontent manifested itself in verbal communication (phone calls) and the printed word (leaflets), the first of which surfaced immediately after the *Morris* decision by the appellant phoning Judge Turgeon's chambers and referring to her as "Judge Bimbo, ... a cockroach, ... a gangster, [and] a mobster." And, albeit advised that his recourse was to appeal the decision, the appellant "demanded his money back from Judge Turgeon. He insisted that Judge Turgeon stole his money...." The appellant persisted in his efforts by contacting the Judge's chambers

demanding repayment and using the same derogatory re-
marks to identify the Judge.

After the *Butts* decision, the appellant did not relent in his
telephonic contacts with the Judge's office, which were taped
until the end of August of 1993 and reactivated in November
of 1993, and numbered at least twice a week during that
period. In a December 3, 1993, communication, when the
Judge's secretary inquired if his intentions were to "alarm and
disturb" the Judge, the appellant replied:

> I would hope that my calls alarm her. I am working very
> hard at it. If my calls are disturbing wait until she sees
> what happens next.

The appellant "admitted" that his purpose was to upset the
Judge. Also, the secretary was "very upset after each call.[1]
[She] was intimidated" because she never knew what the
appellant would do given such statements as: "[W]ait and see
what's going to happen next."

The secretary stated that the Judge's work habits changed
with the onslaught of disparaging phone calls and accompany-
ing fliers distributed throughout the Courthouse, to pedestri-
ans and placed on vehicles in the area. Also, when the
appellant obtained a confidential office memo and read it to
the secretary to document his infiltration of the interworkings
of the office, the Judge's conduct changed drastically; to-wit:
1) the jurist began to carry a gun; 2) a peephole was installed
in the door entering into the chambers; 3) office door locked
at all times; 4) work environment changed between the secre-
tary and Judge in that it became "more stressful"; 5) security
guard had to be present in court before Judge would enter;
and 6) Judge carried a weapon into courtroom.

**1.** The chronology of calls following the *Morris* decision (March 30th),
and up to and following the *Butts* ruling (May 3rd), consist of the
following dates: April 22, May 19 & 27, June 3, 4, 14 & 16, July 12 (two
calls), 13–16, 26 & 27, August 3 & 11, November 22, December 2, 3, 7
(two calls) & 15.

From January to August of 1993, the same type of conduct was
exhibited over the phone by the appellant, i.e., messages calling the
Judge a "mobster".

To the preceding list, the Judge testified that security was increased in the Courthouse, and a lock was installed between her chambers and the courtroom, photographs of the appellant were placed at her chambers, distributed to Courthouse personnel, her baby-sitter and children. Further, her children's play-habits were curtailed, bodyguard service was provided to and from the Courthouse, Judge stopped taking routine lunch-time walks, Judge's home watched by city police, home phone was equipped to "register" all calls because of "hang-ups", home security was activated more frequently, and informing her children of the appellant upset the Judge.

The jurist admitted that she spoke to the appellant on two occasions, but she was briefed by her secretary on the substance of all of the appellant's calls, and Courthouse security advised her of the appellant's activities within and about the Courthouse. Also, because the jurist had heard testimony in the *Morris* and *Butts* cases indicative of the appellant's volatile behavior when he did not get his way,[2] she believed the appellant was "a potentially very dangerous man." Finally, the jurist testified that she felt "threatened" because of the frequency and substance of the appellant's phone calls; to-wit:

a) July 26: Judge would be refunding the appellant's money. "That [the appellant was] willing to bet on [it] . . . [and] gonna pay for that plus interest."

b) July 27: Appellant was told no repayment would be forthcoming, to which he responded: "Oh, yeah, well, I will—I'll take it . . . ."

c) Aug. 3: Appellant told Judge's secretary: "This is her last week to straighten this mess up."

d) Aug. 11: Appellant's message to Judge: "Tell that stinkin' bitch I will collect."

---

**2.** In *Morris*, the tenant would not leave the premises so the appellant, in mid-January, broke the front windows of the premises with a crowbar. When the police arrived, the appellant had left and the window frames were covered with cardboard to allow the tenant to remain. However, when the appellant appeared a second time and pulled the cardboard from the window frames, the tenant exited the area and, subsequently, moved for fear of the appellant's reprisals and had to secure a new job.

e) Dec. 6: Appellant was asked if he believed his calls were emotionally upsetting, to which he answered: "I would hope so, I work hard enough at it. If she thinks she's upset now she hasn't . . . seen the beginning of it yet."

—Appellant asks if the Judge's "bodyguard . . . i[s] . . . still in the bodyguard business."

—Appellant was told that Judge did not know what he was going to do next and he said: "oh, I bet."

—Pamphlets were discussed and the appellant stated: " . . . that's just the beginning." And, to "[t]ell Judge Turgeon to send [him] the money back that she stole and . . . then he stops." He further indicated that "so far [he's] made good on ever [every] threat that [he] made." Also, when he was asked if he was "returning that fear to the judge because of what [has been] done," the appellant remarked: "oh, yes, I think I'm doing a fine job. If she thinks she's upset now, I've just begun. . . . Then, the appellant spoke about the fear that the Judge instilled: "She's getting a taste of it now. I'd say I'm doing a pretty good job of that . . . tell that cockroach Jeannine Turgeon that I've just begun."

—Appellant phoned a second time and was advised that the calls were serving no legitimate purpose. He responded: " . . . by the time . . . I'm done with her she's gonna wish to God that she never stole a penny from me or anyone else. Oh, I've just begun." And "she is just now getting a taste of the beginning of it."

f) Dec. 7: Appellant phones and talks about the bodyguard for the Judge and her carrying a gun "to let [her] know that he's watching . . . and knows what is going on."

—Although the appellant was told that his calls were making the Judge ill, he retorted: "Well, I hope so." When told to cease, the appellant said: "I decide when I stop and when I start * * * and [to] tell that stinkin bitch I will get the money back."

g) Dec. 15: Appellant phoned to say: "If I don't see some effort before Christmas it's going to be a heavy interest. She can bank on that."

It was the defense's position throughout the trial that the appellant's *intent* was to effectuate a change in the landlord/tenant procedure (via leaflet/sign distribution and phone calls to judges, commissioners and the district attorney) regarding the method by which rent was escrowed with the prothonotary. He argued he expended no energy toward threatening, annoying and/or alarming Judge Turgeon in attempting to alter either *Morris* or *Butts*.

The jury, after listening to all the evidence, found the appellant guilty as charged. Post-trial motions were denied, sentence was imposed and this appeal followed raising six issues for our review, the first of which claims that the trial court erred in labelling as irrelevant and inadmissible the testimony of several witnesses; namely:

1) Virginia Antonoplos: She would have testified to assisting the appellant in distributing fliers and writing letters to various legislators and the Department of Public Welfare. In addition, the proposed witness would have disclosed the appellant's "intention" in embarking on this episode of alleged change and reform of the landlord/tenant procedures in the County.

2) Messrs. Carr and McLaughlin: The two were proffered as witnesses experiencing "problems" with the Central Pennsylvania Legal Services (the organization representing indigent tenants, such as Morris and Butts, of which the appellant was complaining) and they would opine that, from a review of the evidence, the appellant posed no "threat" to anyone.

3) Judges Morrison, Hoover and Morgan: These Jurists filed a joint motion to quash subpoenas served by the appellant, which was granted pre-trial on the basis that their testimony would have been irrelevant.

In deciding whether proposed evidence is relevant, material and admissible, it must first be established that such information "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." Black's Law Dictionary 1160 (5th ed. 1979).

We find that Ms. Antonoplos' testimony would not have been illuminating on the charges listing *Judge Turgeon* as the object of the appellant's behavior (repeated phone calls, disparaging remarks and implied threats of retaliation for rulings against his interest and retention of his money). Thus, the court did not err in sustaining the Commonwealth's objection and excluding the testimony as irrelevant.

The same result obtains with regard to Messrs. Carr and McLaughlin and the named Judges, none of whom had information to offer countering Judge Turgeon's claims of harassment and interference with *her* official judicial duties as charged against the appellant.

▮ The second averment of trial error concerns instructions to the jury on the offense of Obstructing or Impeding the Administration of Justice by Picketing, etc. (18 Pa.C.S.A. § 5102(a)), whereby the trial court "directed the jury to consider[, *inter alia,*] the Defendant's telephone calls made to the courthouse as part of the required 'demonstration' " sufficient to establish a violation of Section 5102.

▮ Inasmuch as the appellant failed to object to the instructions before the jury retired for deliberation (see N.T. 494–496, 500), we hold that this issue has not been preserved for appellate review.[3] Pa.R.App.P. 302(a).

▮ The third issue assigns the trial court with error by instructing the jury on "new or different elements beyond

3. Even if, *arguendo,* the issue were not waived, there was sufficient evidence of the appellant handing out leaflets and posting signs in and around the Courthouse, the basis for which was to alter Judge Turgeon's *Morris* decision. 18 Pa.C.S.A. § 5102(a) specifically prohibits conduct (e.g., pickets and other "demonstration"—leaflet distribution) intended to influence "any judge ... in the discharge of his[/her] duty." Here, the appellant was attributed with seeking the return of his money awarded by the Judge to tenants *after* the passage of the 30–day period to appeal, the failure of which to act precluded any possibility of reversal of the rulings. Thus, the appellant's efforts were to sway the Judge to alter her *Morris* order against his interest. This was a clear violation of the statute.

those contained in the Information" regarding the charges of Harassment by Communication and Obstructing or Impeding the Administration of Justice by Picketing, etc. In particular, the Commonwealth charged the appellant under 18 Pa.C.S.A. § 5504(a)(1) as follows:

> Continuing from the beginning of March, 1993, through and including January 19, 1994, acting with the intent to harass, annoy or alarm another person, Judge Jeannine Turgeon, the Defendant, Anton B. Schierscher, engaged in a course of conduct or repeatedly committed acts, which alarmed or seriously annoyed Judge, and which served no legitimate purpose.

The appellant quotes the trial court as instructing the jury that:

> A person commits a misdemeanor of the third degree if with the intent to harass another he makes telephone calls without the intent of legitimate communication or address to or about such other person in any lewd, lascivious, or indecent words or language or telephones another person repeatedly or makes repeated communications anonymously or at extreme[ly] inconvenient hours or in offensively coarse language.

N.T. 493–494. Aside from the fact that the appellant failed to object to the allegedly defective instruction rendering the claim waived (see Rule 302(a)), if such were not the case, our examination of the record discloses that the appellant excludes the language immediately succeeding the complained-of definition of the offense of Harassment by Communication, whereby the trial court *explained the conduct the Commonwealth believed constituted a violation of Section 5504(a)(1);* to-wit:

> ... the Commonwealth contends that this Defendant through the period of March 1993 through and including January of 1994 acted with intent to harass another[,] Judge Jeannine Turgeon[;] the Defendant repeatedly made telephone calls to her chambers or other offices in Dauphin County Court without the intent of legitimate communication.

N.T. 494. Reading the instruction as a whole, and not with judicial blinders, *Commonwealth v. Rodgers,* 459 Pa. 129, 327 A.2d 118 (1974), we conclude that the jury, in fact, was advised of the elemental aspects of the offense of Section 5504(a)(1) and no error was committed in regard thereto.

■ In respect to the allegedly erroneous instruction provided by the trial court as to the offense of Obstructing or Impeding the Administration of Justice by Picketing, etc., the appellant, again, neglected to bring to the trial court's attention the claimed error in advance of the jury deliberating. As such, the issue falls prey to the waiver doctrine invoked when issue-preservation is ignored.[4] See *Commonwealth v. English,* 446 Pa.Super. 569, 667 A.2d 1123, 1126–1127 (1995).

■ The fourth issue posed for examination is the appellant's assertion that his conviction for Obstructing or Impeding the Administration of Justice by Picketing, etc.[5] was violative of his constitutional right to " 'demonstrat[e]' in or near the Dauphin County Courthouse wh[ile] address[ing] matters completely unrelated to any judicial proceeding[, i.e.,] . . . advocating a change in local landlord-tenant policy." Appellant's Brief at 34.

4. Even if such were not the case, our review of the trial court's instruction of the jury as to 18 Pa.C.S.A. § 5102(a) reveals that the veniremen were advised that the appellant could be found guilty of violating Section 5102(a) if they believed he placed signs and distributed leaflets outside the Courthouse for the purpose of influencing Judge Turgeon's rulings (in either *Morris* or *Butts* ).

There was sufficient evidence present to establish that the appellant had placards and fliers disseminated outside and inside the Courthouse with the intent of causing Judge Turgeon to alter her rulings in the *Morris* and *Butts* cases. *Appellant's telephonic* communications, which were believed by the jury, proved his intention was to recoup his money and he would not be deterred from his mission. Any other stated intent was a pure sham disbelieved by the jury.

5. 18 Pa.C.S.A. § 5101(a) provides in pertinent part:

A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act. . . .

■ Under *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), a State may promulgate laws designed to prohibit demonstrations in or near a courthouse, provided the law's intent is to discourage the influence of judges in the discharge of their duty to administer justice.

■ In *Cox*, the United States Supreme Court upheld a statute similar to the one under attack here. In doing so, the Court found that as *applied* and on its *face* the statute was not unconstitutional and stated in support thereof that:

> There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy.

> \* \* \* \* \* \*

> A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence. A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.

> Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association.

> \* \* \* \* \* \*

> "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or

carried out by means of language, either spoken, written or printed."

* * * * * *

We hold that this statute on its face [and as applied] is a valid law dealing with conduct subject to regulation so as to vindicate important interests of society and that the fact that free speech is intermingled with such conduct does not bring with it constitutional protection.

379 U.S. at 563–564, 565, 85 S.Ct. at 480–481, 482 (Citation omitted).

Although *Cox* held the statute valid as "applied" and on its "face", the Court found that the police's directive to disburse after authorizing the appellant to demonstrate across the street from the courthouse invalidated his arrest because "the dispersal order had nothing to do with any time or place limitation, and, thus, on this ground alone, it [wa]s clear that the dispersal order did not remove the protection accorded appellant by the original grant of permission" rendering his conviction subject to reversal. 379 U.S. at 573, 85 S.Ct. at 485.

Here, unlike in *Cox*, the appellant dispensed leaflets and set-up placards on the Courthouse property, the stated purpose of which the jury concluded was to induce Judge Turgeon to alter her *Morris* and *Butts* decisions.[6] Therefore, the statute as "applied" and on its "face" does not contravene any known constitutional rights of the appellant, given the appellant's "intention" for demonstrating and the State's right to insulate its judiciary from outside influences regarding the

6. The trial court specifically instructed the jury that the appellant's "evidence shows and he wants you to find as a fact that his purpose [in picketing and leaflet distribution] was not to [influence the judges in the discharge of their duty], but to change the [landlord/tenant] system. The Commonwealth says he was doing that to get money back to influence the decision [of Judge Turgeon]." N.T. 496.

Thus, the jury, as the assessor's of credibility had to weigh the evidence and believability of the witnesses in deciding the appellant's intent, which, from the verdict, was to obstruct justice. This being the bailiwick of the jury, and the evidence being supportive of the verdict, we may not interject ourselves into the truth-determining process or reverse the conviction for violation of 18 Pa.C.S.A. § 5102(a).

administration of justice. See *Cox*, supra, and compare with *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983).

■ The next claim argues the commission of reversible error on the part of the trial court in commenting upon the facts of the case and analogizing the appellant's conduct to yelling "fire" in a crowded movie theater when there is no fire. Again, as with issues 1 and 3, the appellant has failed to lodge an objection at the close of the court's instruction to the comments now raised as error. This repeated neglect in complying with established issue-preservation rules dispenses with the need to address this issue as it has been waived for appellate purposes.[7] See *English*, supra; Rule 302(a).

Lastly, we address the appellant's protestations that the trial court committed reversible error when it denied the appellant's Motion to Dismiss Harassment and Stalking under 18 Pa.C.S.A. § 2709 as violative of his rights under the First and Fourteenth Amendments to the United States Constitution.

■ In this jurisdiction, an act of the Legislature is presumed constitutional, and the law will not be declared unconstitutional unless it clearly, plainly and palpably violates the Constitution. Further, all doubts are to be resolved in favor of upholding a piece of legislation as constitutional. See *Commonwealth v. Blystone*, 519 Pa. 450, 549 A.2d 81 (1988); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982).

■ With regard to the harassment provision of 18 Pa. C.S.A. § 2709(a), this Court has ruled it constitutional against attacks of "vagueness" or as violative of the Fifth and Fourteenth Amendments to the United States Constitution. See

---

7. Were the issue not waived, we would find that nothing on the record buttresses the appellant's contention that the trial court's statement of law was erroneous or "prejudiced" the jury into concluding that his conduct was "unjustified and illegal." The trial court's reference that free speech has its limitations when utilized to incite panic or violence in a "movie theater" by yelling "fire" was proper. See *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

*Commonwealth v. Duncan,* 239 Pa.Super. 539, 363 A.2d 803 (1976) (en banc). Consequently, this ends the appellant's constitutional challenge to Section 2709(a), inasmuch as the appellant's persistent and abrasive use of the telephone and leaflet distribution amounted to a course of conduct (extending almost 1 year) aimed at "alarming or seriously annoying" Judge Turgeon without any legitimate purpose.

Similarly, Subsection (b) of Section 2709 (Stalking) withstands constitutional scrutiny despite the appellant's averments that it is "vague" because men must guess at its meaning or "overbroad" since it "reaches a substantial amount of constitutionally protected conduct." See Appellant's Brief at 38–39, citing *Commonwealth v. Mikulan,* 504 Pa. 244, 470 A.2d 1339 (1993) and *Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

The appellant cites us no cases, nor are we able to locate any, announcing a constitutional right to "engages in a course of conduct or repeatedly commits acts toward another person ... intent to cause substantial emotional distress to the person." 18 Pa.C.S.A. § 2709(b)(2) (Supp.1995–96).

The Stalking statute is quite clear that engaging in *repetitive* conduct aimed at an individual evidencing an "intent" to evoke "substantial emotional distress" is prohibited conduct. Here, the appellant was advised on numerous occasions that his telephonic communications with the Judge and her staff, in addition to distributing leaflets and erecting placards in and near the Courthouse, disparaging the Judge *to recoup monies awarded by the jurist to tenants beyond her ability to reverse,* produced "emotional distress" altering her lifestyle and needed to cease. The appellant, instead of heeding the warning of cessation, merely fueled the fire of discontent without regard to the repercussions upon the object of his derision.

At bar, we have no hesitation in finding that the appellant was placed on notice, repeatedly, of the deleterious effect his "course of conduct" was having upon Judge Turgeon (placement of locks and peepholes on doors, guards to attend

her ingress and egress from the Courthouse, security personnel in her courtroom, lunchtime excursions terminated and a weapon carried on her person became commonplace). In spite of all efforts to cause the appellant to cease and desist *directing* his *conduct* at Judge Turgeon, his actions continued unabated under the cloak of the First Amendment right to free speech. As the trial court aptly stated on this point:

> The right of free speech and address is a shield and not a constitutional sword with which to do harm to others. It needs no citation of legal precedent to announce that the freedom of speech is not absolute. Speech specifically designed to coerce through fear and intimidation are not essential parts of the exposition of ideas and they are of such insignificant social value as a step to the truth that any benefit that may be derived from them is clearly outweighed by the societal interest in order and morality. Repeated acts and words which are designed to, and, in fact do, seriously offend the average person and put them in fear are not protected by the First Amendment.

See also *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942).

Premised upon our review of the applicable law, we hold that the Stalking statute is constitutional and reasonably restricts conduct without being "vague" or "overbroad." Compare *Commonwealth v. Brehm*, 444 Pa.Super. 138, 663 A.2d 712 (1995) (Section 3731(a)(5) of the DUI statute upheld as constitutional against attacks of being "vague" and "overbroad").

For the reasons herein stated, we find none of the appellant's arguments to be meritorious. Accordingly, the judgment of sentence is affirmed.

Judgment of sentence affirmed.