**Commonwealth v. Ruby**

516

C.P. of Erie County, nos. 2834 & 2835 of 1995.

*Robert A. Sambroak Jr., assistant district attorney,* for the Commonwealth.
*Dennis V. Williams,* for defendant.

CONNELLY, *J.,* March 20, 1996—On January 19, 1995 the defendant was charged by criminal information with the following crimes:

*"No. 2834 of 1995—*

Receiving stolen property;

Prohibited offensive weapons;

Resisting arrest or other law enforcement;

Firearms not to be carried without a license.

*"No. 2835 of 1995—*

Retaliation for past official action."

On January 11, 1996 the defendant filed an omnibus pretrial motion and raised the following issues:

(1) Motion to recuse;

(2) Motion for change of venue;

(3) Motion to quash the charge of retaliation for past official action;

(4) Motion to quash charge of resisting arrest; and

(5) Motion to suppress evidence obtained as the result of an alleged illegal search of the defendant.

By order dated January 11, 1995, the court denied the defendant's motion to recuse (this was later withdrawn by the defendant as well), and granted hearing on the remaining issues. Said hearing was held before the court on February 27, 1996. At that time the defendant withdrew his motion for change of venue upon agreement that this court would preside over the defendant's trial and set a date certain for that trial.

## I. FACTS

The genesis of the defendant's retaliation can be traced back to January of 1990, when he was sentenced by the Honorable Michael T. Joyce, the victim, to a total period of two years incarceration and 13 years probation. He was released on parole on December 22, 1990.

On or about September 25, 1995, fliers containing disparaging remarks directed against Judge Joyce were distributed throughout Erie County and sent to various attorneys in town. (See Addendum A.) The flier accused the judge of various acts of moral turpitude, and attacked his professional character as being nothing more than incompetent. The flier also contained detailed information regarding his children and ex-wife, going so far as to include the exact street address, home phone number and place of employment, as well as their detailed daily activities. At the preliminary hearing, the judge testified to the following:

"I started putting things together that the only way that some of this information could be put together is through an investigation. Actually, it was an organized type of situation, which made me very concerned that if the person goes to this length, that they might harm my children or harm my former spouse or even myself. So I've taken measures basically and have contracted with a security agency to make sure that nothing happens. . . .

"Aside from losing a lot of sleep, being concerned about my children—I think you have a child that you're probably pretty concerned about too and you can understand this, that when they're mention in (the flier) along with a former spouse, it concerns me, not my own personal safety, but their safety more so. I take this job and I know that there's all kinds of nuts running out there that could do harm to you, but you don't think that they're going to go after your family.

"So that personal fear about losing sleep, what am I going to do, how am I going to protect them, hearing about a boxer rebellion—which I ask you to remember history and that was a very bloody affair—indicates that this could be very, very serious, and it concerned me greatly. It harmed me. It made me a nervous wreck." (N.T., Preliminary hearing, 11/30/95, pp. 12, 23-24.)

In response to the fliers and the perceived threats, the judge had the members of the local police watch over his house and that of his former wife's house, and made arrangements with a private security firm to increase protection. (N.T., 11/30/95, p. 17.)[1] Further,

---

1. This refers to the transcript of testimony given at the defendant's preliminary hearing which was submitted to the court by the parties in lieu of testimony at the suppression hearing. Only Officer Faulkner was called to testify briefly at the suppression hearing to supplement the transcript.

the fliers were distributed around the time when the judge was running for retention. As a result of said fliers being distributed, the judge was contacted by Erie County voters who expressed negative comments directed towards the judge.

The investigation and the surrounding events leading up to the defendant's arrest are as follows. In the wee hours of the morning on October 10, 1995, Officer Robert Williams stopped near 17th and Cherry Streets to investigate a possible prostitution offense.[2] (N.T., 11/30/95, pp. 72-73.) The officer testified that this area was given special attention because of the high intensity of crime in that area. Also, the officer testified that he personally observed the individual in question parked near a known house of prostitution with a juvenile prostitute in the car with him. When Officer Williams stopped to investigate, the individual stepped out of the vehicle and fled on foot. Officer Williams relayed the description of the individual over the police radio and continued his search. The description given of the individual was that he had blond hair and dark clothing, and that he had fled from the area of 17th and Cherry Streets.

Shortly afterwards, a second police unit relayed over the radio that they had spotted the individual fitting the description given by Officer Williams, and that they were going to investigate. This was Officer Faulkner (in uniform and in a marked police car) who testified at the suppression hearing that when his unit approached the individual, he pulled his patrol car to the curb and said, "I need to talk to you; take your hands out of your pockets." Whereupon the individual (who turned

---

2. The traffic stop pursuant to this investigation was a separate incident, not involving the defendant, and which involved another individual patronizing a prostitute.

out to be the defendant) said "No way man" and immediately started running. At this point it becomes important to note that the individual found by the second unit was not the same person that Officer Williams saw earlier. (N.T., 11/30/95, pp. 33-34, 41-46.) Rather, this individual was the defendant who happened to fit the description given by Officer Williams.

During this time Officer Thomas Pietras was patrolling the same area and overheard the events described over the police radio. When Officer Pietras arrived at 18th and Walnut Streets, about one block from where the first individual had fled from Officer Williams, Officer Pietras observed a blond-haired man with dark clothing running south behind County Fair convenience store. Officer Pietras, followed by the officers from the second unit, gave chase. Officer Williams at this point overheard on his radio that several officers were chasing an individual whom he had just described. Officer Williams then saw the defendant come out onto the railroad tracks on 19th Street, trying to get away from the other officers. Officer Williams, still thinking that the defendant was the same individual he saw earlier, joined in the pursuit with other officers. During this chase Officer Williams shouted at the defendant to stop. Officer Williams did not recall identifying himself as the police, but he was in uniform and had approached the defendant from a marked squad car. Without stopping, the defendant ran into the neighbor's porch and through the backyard area, and jumped over the neighbor's fence with the police still in pursuit.

Eventually the defendant was stopped by Officer Pietras, who had to tackle the defendant and pull him to the ground to prevent the defendant from escaping. Officer Pietras testified that prior to tackling the defendant, he announced that he was a police officer and

ordered the defendant to stop. *(Id.) The defendant turned around to see who was chasing him, but refused to stop otherwise. (Id.)* The defendant was tackled and pinned to the ground, and other officers came to the aid of Officer Pietras. *(Id.)* However, when they tried to take the defendant into custody he was less than cooperative and was kicking and refusing to be handcuffed. *(Id.* at 76.) The defendant was eventually handcuffed and at that point arrested for disorderly conduct and loitering and prowling. *(Id.* at 77, 82-84.)

The defendant was brought to the police station and an inventory search at the booking counter revealed the following items: spring-loaded knife, loaded Browning semiautomatic, Swiss Army knife, blond wig, fake mustache, small flashlight, can of PUNCH M-3 Mace, staple gun, and various pieces of literature including the fliers in question. (N.T., 11/30/95, pp. 65-69, 77-80.) At the preliminary hearing, Judge Joyce testified that a security camera at Erie Insurance building caught sight of an individual who was wearing a disguise similar to the ones later found on the defendant at the time of his arrest. *(Id.* at 19-23, 39-41.) The individual sighted on the surveillance camera was seen posting fliers onto utility poles near the building. *(Id.)* The officers testified at the preliminary hearing that the individual on the videotape was similar in weight and build as the defendant. *(Id.* at 40.) It was also established at the preliminary hearing that the gun which the defendant was carrying had been stolen. *(Id.* at 58-64.)

The defendant was eventually charged with receiving stolen property,[3] prohibited offense weapons,[4] resisting arrest or other law enforcement,[5] firearms not to be

---

3. 18 Pa.C.S. §3925
4. 18 Pa.C.S. §908
5. 18 Pa.C.S. §5104

carried without a license,[6] and retaliation for past official action.[7] The defendant filed omnibus pretrial motion and raised the following issues: (1) motion to recuse; (2) motion for change of venue; (3) motion to quash charge of retaliation for past official action; (4) motion to quash charge of resisting arrest; and (5) motion to suppress evidence obtained as the result of an alleged illegal search of the defendant.

## II. DISCUSSION

### A. *Motion To Quash the Charge of Retaliation for Past Official Action*

The defendant next argues that the crime of retaliation for past official action, 18 Pa.C.S. §4703, as it is written violates his state and federal constitutional right of free speech. The defendant argues that his statements and actions do not fall within any one of the enumerated exceptions to free speech, such as obscene speech, fighting words, words intending to incite immediate violent conduct, or words intending to cause the overthrow of the government. Further, the defendant argues that even if the statute passes the constitutional muster, his motion to quash should still be granted since the criminal causation is lacking between his alleged criminal act and the harm suffered by the victim. The court disagrees.

### 1. Constitutional Issue

The court will first address the defendant's attack on the constitutionality of the statute in question. In *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the Supreme Court of the United States

---

6. 18 Pa.C.S. §6106
7. 18 Pa.C.S. §4703

found that no constitutional rights are violated by a Louisiana statute punishing picketing near a courthouse. In doing so the Supreme Court noted the following:

"There can be no question that a state has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance the administration of justice be absolutely fair and orderly. This court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy. . . .

"It has never been deemed an abridgment of freedom of speech or press to make a *course of conduct* illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. . . .

"We are not concerned here with such a pure form of expression as newspaper comment or a telegram by a citizen to a public official. We deal in this case not with free speech alone, but with expression mixed with particular conduct. . . .

"We [    ] reaffirm the repeated decisions of this court that there is no place for violence in a democratic society dedicated to liberty under law, and that the right of peaceful protest does not mean that everyone with opinions or beliefs to express may do so at any time and at any place. There is a proper time and place for even the most peaceful protest and a plain duty and responsibility on the part of all citizens to obey all valid laws and regulations." *Cox, supra* at 562-64, 574, 85 S.Ct. at 479-80, 486. (citations omitted) (emphasis added)

In light of the above rule, the court notes that the crime of retaliation for past official action reads as follows:

"A person commits a misdemeanor of the second degree if he harms another by any unlawful act in retaliation for anything lawfully done by the latter in the capacity of public servant." 18 Pa.C.S. §4703.

In reading the above language, it becomes readily apparent that the statute punishes those who by an "unlawful act" harm a public servant for what he or she has done lawfully in the past. Thus, the statute does not punish the defendant for any expression of speech in its pristine form, but with an unlawful act of a totally different character.[8] In that light, the court finds that a state has a legitimate interest in protecting its public servants from unlawful acts which are designed solely to intimidate and harass, rather than pure speech which is intended merely to inform or criticize. Hence, the statute does not violate the defendant's right to free speech.

---

8. The unlawful act is the defendant's violation of the city ordinance 925.21 titled Signs on City Poles Prohibited, which is punishable by a $50 fine. Section 925.21 of the city ordinance provides:

"No person shall paste or otherwise affix any advertisement or sign on any ornamental or other lighting poles owned by the city. However, council may, by resolution duly approved, authorize the placing of temporary signs of an approved type, in connection with any civic or community project. Council may also give permission by resolution to place direction and information signs of a design and type to be approved by it, to bus line companies operating within the city." (Ordinance 7120 §§1, 2, passed 8/31/1828.)

While the offense may seem innocuous, it is nevertheless a crime and an unlawful act. "To act 'unlawfully' means simply to act in violation of the law." *U.S. v. McDade,* 827 F. Supp. 1153, 1186 (E.D. Pa. 1993), *affirmed in part, appeal dismissed in part* 28 F.3d 283, *rehearing and rehearing en banc denied.*

This particular statute was derived from section 240.4 of the Model Penal Code. The commentary to this section provides the following:

"[T]he need for [section 240.4] is lessened by the fact that many of the more serious forms of retaliation are independently criminal. It remains true, however, that retaliation can be accomplished by unlawful acts that are not crimes but that should be proscribed as such when they are used in response to action lawfully taken by a public servant. Retaliatory conduct is not only especially reprehensible when engaged in for such a motive, but it also implies a threat of further retaliation for future adverse action and thus poses a danger to the integrity of government. Section 204.4 is designed to protect against these evils. . . .

"The conduct proscribed by this offense is inflicting harm 'by any unlawful act.' As is explained in the commentary to section 240.2,[9] the term 'unlawful' includes any criminal or civil wrong for which the law provides a remedy. . . .

"Under the section 240.0(3)[10] definition of 'harm,' the concept would include public criticism, withdrawal of friendship or political support, or any other kind of loss or disadvantage. . . .

"Similarly, the 'unlawful act' engaged in by the perpetrator of the offense need not be known by him to be unlawful. It is sufficient if he knows of the nature of the conduct and if it is in fact conduct that the criminal or the civil law recognizes as unlawful." Model

---

9. Model Penal Code §240.2 (official draft and revised comments 1980), threats and other improper influence in official and political matters.

10. *Id.* Section 240.0(3) Definitions.

Penal Code §240.4 comment 1. (Official draft and revised comments 1980.) (footnotes added)[11]

The intended scope and the overall rationale found in the Model Penal Code is very similar to the concerns addressed by the Supreme Court in *Cox v. Louisiana.* Section 240.4 is designed not to punish those who express their opinions, but rather it is designed to punish those whose sole purpose is to harass and embarrass public servants, and whose singular motive is fueled by retaliation for past official conduct. Further, section 240.4 does not prohibit free speech, but rather prevents an individual from intimidating public servants through an unlawful act.

Section 240.4 of the Model Penal Code has not been widely copied by other states, with Pennsylvania, New Jersey and Texas being the only states who have adopted said provision. Among these three, only Pennsylvania and New Jersey have adopted a language which is identical to section 240.4 in substantive coverage. Regardless of its popularity, however, the court notes that the present case involves the exact kind of conduct which the law was designed to prevent. Namely, in preventing an unlawful act which seems benign in insolation, but when coupled with its spiteful words and retaliatory motive is meant to harass and intimidate public servants, and thus pose a danger to the integrity of the government.

11. The commentary to section 4703 of the Pennsylvania Crimes Code provides that "This section is derived from section 240.4 of the Model Penal Code. There is no similar crime under existing law. The penalizing of such conduct is deemed necessary so that public servants may act without fear of future 'revenge.' Some forms of retaliation would, of course, be independently criminal, *e.g.,* assault." 18 Pa.C.S. §4703 official comment (1972).

Recently, in *Commonwealth v. Schierscher,* 447 Pa. Super. 61, 668 A.2d 164 (1995), the Superior Court of Pennsylvania upheld, inter alia, the conviction for retaliation for past official action. In *Schierscher* the defendant lost two cases in front of the judge-victim in which the defendant was a party. The defendant then embarked on a year-long campaign of distributing leaflets in and outside the courthouse, as well as making an endless stream of phone calls to the judge and other members of the local judiciary and county commissioner, denouncing the judge as a robber and a thief. As the result of such action, the judge testified at trial that she began to carry a gun, installed a peephole in the door entering into the chambers, began locking the office door at all times, noticed an increase in stress level in the office, had a security guard present in the court before she would enter, and carried a weapon into the courtroom. Further, the play-habits of the judge's children were curtailed, bodyguard service was provided to and from the courthouse, the judge stopped taking routine lunch-time walks, and her home phone was equipped to "register" all calls.

In addressing the issue of the defendant's right to free speech and expression, the Superior Court adopted the reasoning set forth in *Cox v. Louisiana,* and noted the following comments by the trial court in that case:

"The right to free speech and address is a shield and not a constitutional sword with which to do harm to others. It needs no citation of legal precedent to announce that the freedom of speech is not absolute. Speech specifically designed to coerce through fear and intimidation are not essential parts of the exposition of ideas and they are of such insignificant social value as a step to the truth that any benefit that may be derived from them is clearly outweighed by the societal

interest in order and morality. Repeated acts and words which are designed to, and, in fact do, seriously offend the average person and put them in fear are not protected by the First Amendment." *Schierscher, supra* at 79, 668 A.2d at 172, citing *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72, 62 S.Ct. 766, 768-69, 86 L.Ed. 1031 (1942).

The circumstances surrounding the present case are not too far from those found in *Schierscher.* More importantly, however, the essential reasoning for upholding the statute in question is the same. The defendant cannot hide behind the cloak of free speech to embark on a mission which is to harass the public servant for what he or she has done lawfully in the past. This conclusion is especially warranted when the speech is commingled with an act which is itself unlawful. Thus, for all the reasons set forth above, the court finds that 18 Pa.C.S. §4703 does not violate the defendant's right to free speech, and denies his motion to quash said section.[12]

## 2. Criminal Causation

The defendant argues that even if 18 Pa.C.S. §4703 passes the constitutional muster, the motion to quash should still be granted since the criminal causation is lacking between his alleged criminal act and the harm suffered by the victim. Basically, the defendant argues that the unlawful act in question is the posting of fliers

---

12. Cf. *Puckett v. State of Texas,* 801 S.W.2d 188, 192-93 (Tex.App.—Houston [14th Dist.] 1990), *cert. denied,* 112 S.Ct. 606, 116 L.Ed.2d 629 (the central purpose of the retaliation statute is to encourage a certain class of citizens to perform vital duties without fear of retribution; hence, this article, on its face, neither abridges constitutionally protected speech nor inhibits individual's right to petition for redress of grievances).

onto utility poles. The defendant argues that this act, in and of itself, is not harmful to the victim. Only when this seemingly harmless act is coupled with the content of the speech does the victim suffer harm. However, the speech itself is, or should be, protected under the First Amendment. Thus, the defendant cannot be held criminally liable under section 4703 when the causation between the unlawful act and the harm suffered is not direct and substantial.

For example, the defendant may argue that if he merely distributed the fliers in question near a utility pole, assuming that there is no law against such a conduct, his action would not be subject to criminal sanction, even if such action could form a basis for a civil action. See *Commonwealth v. Rementer,* 410 Pa. Super. 9, 18, 598 A.2d 1300, 1304-1305 (1991), *appeal denied,* 533 Pa. 599, 617 A.2d 1273 (1992) (in order to impose a criminal liability, the causation must be direct and substantial, and the defendant should not be exposed to a loss of liberty based on a tort standard which only requires that the event giving rise to the injury be a substantial factor).

As to this argument, the court incorporates its previous discussion on the constitutional issue, and notes that there is a direct and substantial link between the defendant's unlawful act and the victim's injury.

Determining the causation in a criminal context involves a two part inquiry. *Rementer, supra* at 19-20, 598 A.2d at 1305. First, the court must decide whether the defendant's conduct was the operative cause of the victim's injury; that is, the conduct must be "an antecedent but for which the result in question would not have occurred." *Id.* Second, the court must determine whether "the result of defendant's actions were so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Id.* In

that context, the court notes that the present case satisfies both requirements.

First, it cannot be doubted that but for the defendant's decision to put up the fliers in question, the injury to the victim would not have occurred. While it is true that the act of putting up a flier is itself innocuous, it defies common logic that anyone would put up a blank sheet of paper onto a utility pole for the pure sake of violating the specific city ordinance. The fliers are put up for a specific purpose, that of communicating a message to whoever would read its contents. Thus, the act of putting up a flier and the message it contains cannot be separated; and if the fliers were never placed on the utility poles no one would have read them, and no harm would have befallen the judge. True, the defendant could have distributed the fliers by another means less unlawful; however, the defendant did not do so and chose the method which best suited his purpose. In that instance, the court will not engage in an endless speculation of what could have happened in light of what did happen. Second, the court notes that the result of the defendant's action is not so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally liable. As noted previously, when someone places a flier for everyone to see, common sense would dictate that others would read them. If the contents of the fliers are disparaging and meant to embarrass and intimidate, then it would seem logical that the perpetrator could be held liable under section 4703 for retaliation for past official conduct. Thus, the causation element is met and the defendant's motion to quash section 4703 for lack of causation is denied.[13]

---

13. Of course, all this causation argument could be academic in light of the fact that the Model Penal Code, from which section 4703 is derived, seems to define an "unlawful act" as any criminal

## B. *Motion To Quash Charge of Resisting Arrest*

The defendant argues that taking all the evidence as presented by the Commonwealth as being true, there is still no legitimate basis or a probable cause for arrest of the defendant. The defendant argues that the law does not allow for resisting of an unlawful arrest. Hence, in order for there to be resisting arrest, the police officer must have probable cause to stop and detain the defendant.

As to this argument, the court will first address whether there was a lawful arrest, and then address the issue of whether the facts supported resisting arrest.

### 1. Lawful Arrest

"[T]he Commonwealth is required to establish that the arrest of appellant was lawful in order to establish one of the essential elements of the offense of resisting arrest." *In Interest of Barry W.,* 423 Pa. Super. 549, 558, 621 A.2d 669, 674 (1993), *affirmed* in 540 Pa. 22, 655 A.2d 492 (1995), case consolidated with *Commonwealth v. Biagini,* 428 Pa. Super. 634, 627 A.2d 199 (1993). The lawfulness of one's arrest can be examined from two viewpoints: (1) whether there was a probable cause to arrest the defendant; or (2) whether there was a reasonable suspicion to conduct an investigatory stop even though the officer lacked probable cause to make an arrest. Presently, the court notes that while the officer may have lacked probable cause to approach and detain the defendant, the officer had reasonable suspicion to conduct a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)

---

or civil wrong for which the law provides a remedy. Hence, even if the defendant did not violate any city ordinance, the civil action of defamation could provide the unlawful act necessary for the crime.

(allowing police to make a temporary investigatory stop when reasonable suspicion is present).

"If [the] police have a reasonable suspicion that criminal activity is afoot, they may make a temporary, investigatory stop even though they lack probable cause to make an arrest." *Barry W., supra* at 559, 621 A.2d at 675. (citations omitted) "The initial stop of a person is legitimate if the investigating officers [c]an point to specific and articulable facts which in conjunction with rational inferences deriving therefrom reasonably warrant the intrusion." *Id.* Thus, a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be the most reasonable course of conduct in light of the facts known to the officer at the time. *Id.* In that light reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. *Id.* at 561, 621 A.2d at 676. Both factors are considered in the "totality of the circumstances" test, and the court must take into account the facts known to the officers from personal observation, and give the anonymous tip the weight it deserves in light of its indicia of reliability as established through independent police work. *Id.* at 562, 621 A.2d at 676.

In reviewing the facts leading up to the arrest, the court notes that Officer Williams had the requisite reasonable suspicion to approach and question the individual who eventually led to the arrest of the defendant.[14]

---

14. The initial chain of events leading up to the defendant's arrest involved a different individual, and not that of the defendant. However, the lawfulness of the *Terry* stop initiated by Officer Williams, as it relates to the first individual, becomes important in light of the fact that subsequent *Terry* stops by other officers are dependent on the information first provided by Officer Williams.

Before discussing the particular facts of this case, however, the court recalls the following with regard to the defendant's flight upon being approached by the uniformed police officer, and the requisite factors justifying a *Terry* stop:

"This court has previously held, that flight, in and of itself, cannot constitute probable cause to arrest. . . . The mere fact that a person 'quickens his pace' upon being observed by police and starts to run when a police officer begins to chase him *does not* give rise to a reasonable belief that criminal activity is afoot, *and is therefore insufficient to justify even a* Terry *stop, absent some other factor which would give rise to criminal conduct.* . . .

"[I]n order for a stop, or 'seizure,' to be reasonable, and therefore legal under *Terry v. Ohio,* the police officer's reasonable and articulable belief that criminal activity was afoot must be linked with his observation of suspicious or irregular behavior on behalf of the particular defendant stopped. . . . Mere presence near a high crime area or in the vicinity of a recently reported crime does not justify a *Terry* stop. . . . Conversely, an officer's observation of irregular behavior without a concurrent reasonable belief that crime is afoot renders a stop unreasonable." *Barry W., supra* at 564, 566-67, 621 A.2d at 677-79. (citations omitted) (emphasis in original)

Instantly, the court notes that Officer Williams approached an individual who was in a high crime area, who had parked near a known house of prostitution, and who had a juvenile prostitute in the car with him in the wee hours of the morning. This observation by Officer Williams prompted him to approach the individual and further investigate the matter. Clearly, at this juncture the investigating officer was able to point

to specific and articulable facts which in conjunction with rational inferences warranted the intrusion. In light of the facts known to the officer at the time, the officer was justified to conduct a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information. Of course, when Officer Williams approached this individual, the individual took flight. While flight, in and of itself, cannot constitute probable cause to arrest, this fact in conjunction with the officer's previous observations made the subsequent need for the *Terry* stop even stronger. Again, it must be noted that this case does not turn on flight alone, or any other single factor which, if taken alone, would be too weak to provide the basis for a reasonable suspicion. However, the case before the court involves not a singular event, but a series of events and circumstances, that when taken in their totality, provide the necessary basis for the reasonable suspicion. In that light, Officer Williams' *Terry* stop of the individual in question was proper. Cf. *Commonwealth v. Lagana,* 517 Pa. 371, 375, 537 A.2d 1351, 1354 (1988) *(Terry* stop and frisk permissible where radio broadcast indicated a white male in his mid-twenties wearing a yellow raincoat was at the corner of 9th and Wharton Streets with a gun, and upon arriving two minutes later the officers observed the described individual who made his presence more obvious because he was casing a business establishment with a pair of binoculars in the pouring rain); *Barry W., supra* at 561, 621 A.2d at 675 (where there was no description of the alleged felon, and the anonymous tip possessed no other indicia of reliability, the radio bulletin to "investigate male selling drugs" at a specific location was insufficient as a matter of law to establish reasonable suspicion to support a stop

in the absence of corroborating observations by the investigating officers); *Commonwealth v. Johnson,* 444 Pa. Super. 289, 293-94, 663 A.2d 787, 789 (1995) (when an officer observed the defendant throwing a number of baggies with their corners missing out of the car's window, the officer was justified in conducting an investigatory stop, knowing from his years as a narcotics detective that illegal drugs are often packed in corners cut from such baggies).

Having determined that the initial *Terry* stop by Officer Williams was supported by reasonable suspicion, the court now turns to the facts and circumstances surrounding the defendant's arrest. When the first individual fled from Officer Williams, the officer was at that point justified, if not obligated, to pursue the investigation and elicit the help of other officers nearby. With that purpose, Officer Williams gave the description of the individual and the exact location from which the suspect had fled. Soon thereafter, a second police unit spotted an individual who fit the description and who was in the same vicinity. This individual, of course, was the defendant and not the person who had earlier fled from Officer Williams.

At this juncture it is important to note the time of the day during which all this took place. Clearly, the singular description of "blond hair and dark clothing" is wanting in more details. The court notes that had the police officers conducted an investigatory stop of the defendant during midday, where many individuals fitting that description might be roaming the streets, then the facts and circumstances would not have supported reasonable suspicion. However, the court notes that it was about three or four in the morning when these events took place. Thus, given the early hours of the morning, and the high degree of probability that

not many individuals, let alone another individual fitting Officer Williams' description, would be spotted in the exact vicinity where an officer reported an individual fleeing, the officers from the second unit had the requisite reasonable suspicion to conduct an investigatory stop to determine at least the identity of this individual, or to maintain the status quo momentarily while obtaining more information. But the *Terry* stop was never completed, as on this night of investigatory stops and unexplainable flights, the defendant fled upon seeing the police officers. Thus, in an unbroken chain of events first started by Officer Williams, the police officers pursued the individual, now the defendant, who they believed to be the person first spotted by Officer Williams.

Flight, in and of itself, cannot constitute probable cause to arrest. The defendant's initial flight from the second police unit was exactly that—a flight, and nothing more. However, a simple flight turned into a disorderly conduct when the defendant was repeatedly told by various officers to stop, which he ignored, and the defendant ran into the neighbor's porch and through the backyard area, and jumped over the neighbor's fence with the police still in pursuit. This long pursuit between five officers and one defendant ended when Officer Pietras tackled the defendant and pulled him to the ground. Cf. *Commonwealth v. Roth,* 366 Pa. Super. 575, 584, 531 A.2d 1133, 1137-38 (1987), *appeal denied,* 518 Pa. 625, 541 A.2d 1137 (1988) (although standing on a public sidewalk expressing dissatisfaction and reading from a bible were constitutionally protected exercises of right to free speech, the defendants' action transgressed from peaceful protest to disorderly conduct when, despite warnings to the contrary, they moved to gain entry of a church in which they were adamantly

unwelcome); *Commonwealth v. DeLuca,* 528 Pa. 290, 292, 597 A.2d 1121, 1122-23 (1991) (the evidence supported disorderly conduct conviction of the defendant, when the police responded to a stabbing incident outside a local tavern, and the officers directed the defendant who was observed hurrying away from a small group which appeared to be a focal point of the incident to remain until they made assessment of the situation; at which point the defendant responded that he was leaving and directed the officers to get out of his way, the defendant continued to shout vulgarities at the officer when requested again to remain still, and when the officer placed his hands on the defendant's shoulder and again repeated the instructions, the defendant pushed the officer's hand off his shoulders and continued to use vulgarity).

Therefore, facts and circumstances supported Officer Williams' initial stop of the individual in relation to the prostitution offense. Thereafter, a series of unbroken chain of events initiated by Officer Williams, but ultimately carried out by the defendant, justified the continued pursuit and the disorderly conduct charge which followed. The defendant was initially arrested for disorderly conduct and loitering and prowling. For the reasons set forth above, the court finds that the arrest was lawful.

## 2. Resisting Arrest

Once the lawfulness of the arrest is established, the court needs to examine the degree of resistance necessary to support resisting arrest. In *Commonwealth v. Lyons,* 382 Pa. Super. 438, 449, 555 A.2d 920, 925 (1989), the Superior Court noted that the evidence was sufficient to establish the degree of resistance necessary to support the resisting arrest conviction, when the de-

fendant fled from the sheriff's deputies into a frigid creek with slippery bottom, he was kicking and struggling to get away, he refused to walk after capture, and four deputies were required to subdue the defendant. Neither severe bodily injury nor actual injury to the arresting officers is required to support the resisting arrest conviction. *Id.* Sufficient resistance to arrest is established if the defendant's actions created a substantial risk of bodily injury to the arresting officer. *Id.*

Presently, Officer Williams testified that the defendant was noncompliant throughout the whole arrest, as he was kicking and trying to get his legs under control. The defendant's hands had to be forcibly brought behind him, and the other officers had to hold down the defendant to prevent him from kicking them. Thus, based on the facts of this case and the applicable law, the court finds the requisite degree of resistance necessary for resisting arrest.

## C. *Motion To Suppress*

Lastly, the defendant argues that the arrest for the disorderly conduct was a ruse, and the real motive for the officers arresting the defendant was for distributing the fliers with its disparaging remarks about Judge Joyce. The defendant argues that he was never charged with violating city ordinance 925.21, nor was he charged with disorderly conduct and loitering and prowling. The defendant argues that there was no legal justification for the arrest of the defendant. Further, the defendant argues that he was not searched incident to the arrest, but was searched at the booking counter. However, since there was no justification for the initial arrest, there was no basis for the search of the defendant at the booking counter without a search warrant. The de-

fendant argues that without a valid search warrant or a probable cause, there was no justifiable basis to search the defendant at the booking station or at any other time. The court disagrees.

Search incident to a lawful arrest is the exception to the general requirement that warrantless search is presumed unreasonable. *Commonwealth v. Albino,* 438 Pa. Super. 562, 565, 652 A.2d 953, 954 (1995). "Searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *U.S. v. Crespo,* 868 F. Supp. 79, 85 (M.D. Pa. 1994). The search of the defendant who was suspected of public drunkenness was a valid search incident to arrest for which the police had probable cause, even though the defendant was never charged with public drunkenness. *Commonwealth v. Canning,* 402 Pa. Super. 438, 442, 587 A.2d 330, 332 (1991). "A police officer may conduct a search of an arrested person and the area within his immediate control because of the always present danger in an arrest situation that the arrestee may seek to use a weapon or to conceal or destroy evidence." *Commonwealth v. Tann,* 500 Pa. 593, 598 n.10, 459 A.2d 322, 325 n.10 (1983).

In view of the applicable rule and all the reasoning set forth in this opinion, the court finds that there was a valid arrest of the defendant for disorderly conduct and loitering and prowling. At the time of the arrest, Officer Williams testified that the defendant was arrested for disorderly conduct and loitering and prowling. (N.T., 11/30/95, pp. 82-84.) However, merely because these charges were not later pursued does not make the arrest and the subsequent search of the defendant invalid. In light of the defendant's conduct throughout the chase and his subsequent behavior during the arrest, the of-

ficers were certainly justified in handcuffing the defendant first and bringing him down to the police station to search him there. Thus, the search incident to a valid arrest was proper, even if there was no search warrant. The search revealed weapons and other items which supported the charges at Docket No. 2834 of 1995. Further, contrary to what the defendant claims, he was formally charged with retaliation for past official conduct by way of criminal complaint dated October 12, 1995. (See Addendum B.) Based on the items found pursuant to a valid arrest, the officers were clearly justified in filing said complaint. Hence the defendant's motion to suppress is denied.

Wherefore, for the reasons set forth in this opinion, the defendant's omnibus pretrial motion and the various motions raised therein are denied.

## ORDER

And now, to-wit, March 20, 1996, it is hereby ordered that the defendant's omnibus pretrial motion and the various motions raised therein are denied for the reasons set forth in the accompanying opinion.

---

## ADDENDUM A

## BOXING IN THE KANGAROO COURT?

### With

### The Honorable Michael T. Joyce

### The kangaroo as a prizefighter

Judge Michael T. Joyce, a professional police state advocate, ex-lawyer firm partner, (AKA Practicing

542

Liar), and professional social event attender, is a well-qualified traitor to the United States Constitution. . . .

Wrecking his car in an alcoholic haze on 26th & Colonial Sts. in the winter of 1990-91, his repeated and well-known affection for very young underaged prostitutes which earned him a trip to the County Health & Safety Clinic on 2nd Street in 1992 for a nasty case of gonorrhea, and his constant neglect of wife and children, make him one of our most colorful magisterial personalities on the king's bench. . . .

Because of his constant philandering he now lives at 3304 Baer Beach Rd. Unit C5 in Millcreek off West Lake Rd., where his wife has banished him. He also works at Fantaseas teaching scuba-diving to help support his two boys; Timothy M. and Robert Joyce, who went to Cathedral Prep. Apparently too good to go to the public cesspool schools their father supports for our children daily.

His wife Cynthia L. Joyce, 2533 Pandora Dr., Erie, PA 16505, 454-4541, left with the children, can hardly afford to send them off to private colleges on her $25,000 a year income and investment scams at BHC Securities Inc. with her daily shopping sprees at Kaufmanns and Lazarus, personal trainer at Nautilus, and self-help classes.

Our local heroes in organized masonic crime . . . *i.e.* city council, police chief, mayor, brother judges, lawyers, and especially newsmedia channels 12, 24, 35 and Times-News Newspapers daily conspire to ignore and suppress Michael Joyce's, as well as other "community leaders" dirty laundry and corruption, while daily castigating us. They love his "eriezistable" special court where money always walks and the constitutional God-fearing patriot always gets locked down. . . .

JOIN THE BOXER REBELLION!!!

AND DUMP OUR USELESS DEMOCRACY

Paid For by Robot J. Puppet, Scribe "Concerned Citizens For Martial Law"

ADDENDUM B

CRIMINAL COMPLAINT AND
PROBABLE CAUSE AFFIDAVIT

COMMONWEALTH OF PENNSYLVANIA

vs.

Anthony Ruby W/M
10670 Bowmantown Rd.
Cranesville Pa. 16410

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF: _____

Mag. Dist. No.: 06-1-05          Docket No.:
DJ Name: Hon. Dom DiPaolo     Dated Filed:
Address: 1563 W. 38 St. Erie Pa.    OTN:
Telephone: (814) 451-6520

Reg. Plate No. _____

Annual Sticker No. _____

Operator's License No. _____

| Complaint Number | / | Complaint Numbers if other Participants |
|---|---|---|
| | / | |

| Incident Number | / | UCR Number |
|---|---|---|
| 95401790 | / | |

ORI NO.: Pa 025200____ D.O.B.: 04-05-70___ S.S.#: 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

R.S.A.: _____ A.K.A.: _____

**544**

District Attorney's office ☐ Approved ☐ Disapproved because:
(When the affiant is not a police officer as defined in Rule 51(C) and
the offense(s) charged include(s) a misdemeanor or felony which does not
involve a clear and present danger to any person or to the community,
the complaint shall be submitted to the attorney for the Commonwealth,
who shall approve or disapprove without unreasonable delay)

_____          _____
             (Issue Date)                              (Signature)

I, _____ Det. Brian M. Zimmer _____
                    (Name of Affiant)
of _____ Erie Bureau of Police _____
(Identify Department or Agency Represented and Political Subdivision)
residing at 626 State St., Erie Pa. _____
do hereby state: (check appropriate box)
1. ☒ I accuse the above named defendant, who lives at the address
set forth above or,

   ☐ I accuse an individual whose name is unknown to me but
who is described as _____
☐ His nickname or popular designation is unknown to me and,
therefore, I have designated him herein as John Doe; with violating
the penal laws of the Commonwealth of Pennsylvania at <u>Peach to</u>
<u>Cherry Street on West 18th Street, Erie</u> in <u>Erie</u> County on or about
<u>09/28/95 to 10/09/95</u>
Participants were: (if there were participants, place their names here, re-
peating the name of above defendant)

_____

2. The acts committed by the accused were:
(Set forth a summary of the facts sufficient to advise the defendant
of the nature of the offense charged. Neither the evidence nor the
statute allegedly violated need be cited, nor shall a citation of the
statute allegedly violated, by itself, be sufficient. In a summary case,
set forth a citation of the specific section and sub-section of the
statute or ordinance allegedly violated).
4703 PCC Retaliation for past official action
   Defendant did intentionally, knowingly and recklessly cause harm
to Michael Joyce, a judge of the Commonwealth Court of Common
Pleas, in retaliation for Judge Joyce performing his lawful duties
as a Public Servant.

The defendant did possess and did distribute and did display on utility poles throughout the City of Erie slanderous fliers which were a malicious attack on the character of Michael Joyce and his family, the nature of which caused alarm to Judge Joyce and his family.

In addition, said false and slanderous fliers were posted at a time when Judge Joyce was a retention candidate for the Court of Common Pleas of Erie County. Said false and slanderous fliers were designed to falsely accuse Judge Joyce of illegal and immoral conduct, all of which the defendant knew or had reason to know were false.

These actions were in retaliation for Judge Joyce sentencing the defendant to a State Correctional Institution in 1990 for offenses he committed in 1989. See Erie County Court docket numbers 1363-1560-1561-1562 of 1989, all of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly, or in violation of section 4703 of the Pa. Crimes Code

3. I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges I have made.

4. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of section 4904 of the Crimes Code (18 Pa.C.S. §4904) relating to unsworn falsification to authorities.

October 12, 1995 /s/ Det. Brian M. Zimmer

And now, on this date October 12, 1995, I certify the complaint has been properly completed and verified, and that there is probable cause for the issuance of process.

06-1-05 (Magesterial District) /s/ D. Di Paolo (Issuing Authority)

P.C. . . . Police report made by victim, police investigation.

I, Det. Brian M. Zimmer, being duly sworn according to law, depose and say that the facts set forth in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

/s/ Det. Brian M. Zimmer

Sworn to me and subscribed before me October 12, 1995.

10-12-95 Date, /s/ D. DiPaolo, District Justice

My commission expires first Monday of January, 2000.